

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN RE: CARDIZEM CD ) MASTER FILE NO. 99-MD-1278
ANTITRUST LITIGATION ) MDL NO. 1278
                        ) HON. NANCY G. EDMUNDS

This Document Relates To:

BILLY JOE LIGHTNER, LOMAX STANFORD, ) UNITED STATES DISTRICT
JANOKA, INC. d/b/a THE MEDICINE ) COURT for the MIDDLE
SHOPPE, and FREDERICK MARK FLEGAL, ) DISTRICT OF ALABAMA
on behalf of themselves and all others similarly )
situated, ) Local Case No.:
                        ) CV-99-T-754 (MHT)
              Plaintiffs, )
                    ) Michigan No.: 99-CV-75070   24
    - against - )

HOECHST AKTIENGESELLSCHAFT, )
HOECHST MARION ROUSSEL, INC., and )
ANDRX PHARMACEUTICALS, INC., )

            Defendants. )

BETNOR, INC., d/b/a RELIABLE DRUG ) UNITED STATES DISTRICT
CENTER, and BETTY MORRIS, on behalf of ) COURT for the NORTHERN
themselves and all others similarly situated, ) DISTRICT OF CALIFORNIA

            Plaintiffs, ) Local Case No.:
                    ) 3:98-CV-3609 (MHP)
    - against - )
                    ) Michigan No.: 99-CV-73422   38
HOECHST AKTIENGESELLSCHAFT, )
HOECHST MARION ROUSSEL, INC., and )
ANDRX PHARMACEUTICALS, INC., )

            Defendants. )

[caption continued on following page]

U.S. DISTRICT COURT
EASTERN DISTRICT
FILED 2001 JUL -6

478

AETNA U.S. HEALTHCARE, INC., and          )
AETNA U.S. HEALTHCARE OF                  )
CALIFORNIA, INC., on behalf of themselves )
and all others similarly situated,        )
                                          )
                    Plaintiffs,           )
                                          )
          - against -                     )
                                          )
HOECHST AKTIENGESELLSCHAFT,               )
HOECHST MARION ROUSSEL, INC., and         )
ANDRX PHARMACEUTICALS, INC.,              )
                                          )
                    Defendants.           )
                                          )

UNITED STATES DISTRICT
COURT for the NORTHERN
DISTRICT OF CALIFORNIA

Local Case No.:
98-CV-4729 (MHP)

Michigan No.: 99-CV-73412   13 ✓

---

GALLOWAY, INC., and MERIT AID            )
PHARMACY & MEDICAL SUPPLY, on behalf     )
 of themselves and all others similarly situated, )
                                         )
                    Plaintiffs,          )
                                         )
          - against -                    )
                                         )
HOECHST AKTIENGESELLSCHAFT,              )
HOECHST MARION ROUSSEL, INC., and        )
ANDRX PHARMACEUTICALS, INC.,             )
                                         )
                    Defendants.          )
                                         )

UNITED STATES DISTRICT
COURT for the SOUTHERN
DISTRICT OF CALIFORNIA

Local Case No.:
99-CV-0645 TW (JAH)

Michigan No.: 99-CV-73871   20 ✓

---

AETNA U.S. HEALTHCARE, INC., on behalf   )
of itself and all others similarly situated, )
                                         )
                    Plaintiff,           )
                                         )
          - against -                    )
                                         )
HOECHST AKTIENGESELLSCHAFT,              )
HOECHST MARION ROUSSEL, INC., and        )
ANDRX PHARMACEUTICALS, INC.,             )
                                         )
                    Defendants.          )
                                         )

UNITED STATES DISTRICT
COURT for the DISTRICT OF
THE DISTRICT OF COLUMBIA ✓

Local Case No.: 1:99-CV-193 (RCL)

Michigan No.: 99-CV-74262   13

[caption continued on following page]

| | |
|---|---|
| JAN GABRIEL, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    - against -<br><br>HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC.,<br><br>        Defendants. | UNITED STATES DISTRICT COURT for the NORTHERN DISTRICT OF ILLINOIS<br><br>Local Case No.: 98-C-7147 (ACW)<br><br>Michigan No.: 99-CV-73667 |
| MARSHALL J. ROSS, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    - against -<br><br>HOECHST MARION ROUSSEL, INC., CARDERM CAPITAL L.P., ANDRX CORPORATION and AVENTIS PHARMA AG,<br><br>        Defendants. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS<br><br>Local Case No.: 00-CV-12312<br><br>Michigan No.: 01-CV-70490 |
| CHARLES ZUCCARINI and AETNA U.S. HEALTHCARE, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    - against -<br><br>HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC.,<br><br>        Defendants. | UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION<br><br>Case No.: 98-CV-74043 (NGE) |

[caption continued on following page]

AETNA U.S. HEALTHCARE, INC., on behalf )
of itself and all others similarly situated, )
                                 )
                     Plaintiff, )
                                   )
           - against - )
                                     )
HOECHST AKTIENGESELLSCHAFT, )
HOECHST MARION ROUSSEL, INC., and )
ANDRX PHARMACEUTICALS, INC., )
                                   )
                     Defendants. )

UNITED STATES DISTRICT
COURT for the DISTRICT OF
MINNESOTA

Local Case No.: 99-CV-124 (DWF/
AJB)

Michigan No.: 99-CV-73239

---

SUNSHINE PHARMACY OF NEW YORK, )
INC., on behalf of itself and all others similarly )
situated, )
                                   )
                     Plaintiff, )
                                   )
           - against - )
                                   )
HOECHST AKTIENGESELLSCHAFT, )
HOECHST MARION ROUSSEL, INC., and )
ANDRX PHARMACEUTICALS, INC., )
                                   )
                     Defendants. )

UNITED STATES DISTRICT
COURT for the EASTERN
DISTRICT OF NEW YORK

Local Case No.: 99-CV-1641 (RAD)

Michigan No.: 99-CV-73845

---

JOSEPH D'ESPOSITO and AETNA U.S. )
HEALTHCARE, INC., on behalf of themselves and )
all others similarly situated, )
                                   )
                     Plaintiffs, )
                                   )
           - against - )
                                   )
HOECHST AKTIENGESELLSCHAFT, )
HOECHST MARION ROUSSEL, INC., and )
ANDRX PHARMACEUTICALS, INC., )
                                   )
                     Defendants. )

UNITED STATES DISTRICT
COURT for the SOUTHERN
DISTRICT OF NEW YORK

Local Case No.: 99-CV-2088 (BDP)

Michigan No.: 99-CV-73713

[caption continued on following page]

1369 / CMP / 00050022.WPD v1

| | |
|---|---|
| SHIRLEAN GLOVER and AETNA U.S. HEALTHCARE, INC., on behalf of themselves and all others similarly situated, | UNITED STATES DISTRICT COURT for the WESTERN DISTRICT OF NORTH CAROLINA |
| Plaintiffs, | Local Case No.: 3:99-CV-00169-H |
| - against - | Michigan No.: 99-CV-74377   2 4 |
| HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC., | |
| Defendants. | |

| | |
|---|---|
| EUGENIA WYNNE SAMS, on behalf of herself and all others similarly situated, | UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF TENNESSEE |
| Plaintiff, | Local Case No.: 2:98-CV-348 |
| - against - | Michigan No.: 99-CV-73190   1 D |
| HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC., | |
| Defendants. | |

| | |
|---|---|
| LARRY S. SIZEMORE, on behalf of himself all others similarly situated, | UNITED STATES DISTRICT COURT for the MIDDLE DISTRICT OF TENNESSEE |
| Plaintiff, | Local Case No.: 3:99-CV-42 |
| - against - | Michigan No.: 99-CV-73345   1 6 |
| HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC., | |
| Defendants. | |

[caption continued on following page]



ALBERT EIRICH, on behalf of himself and all others similarly situated,

    Plaintiff,

 - against -

HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF WISCONSIN

Local Case No.: 2:98-1027 (FTW)

Michigan No.: 99-CV-73981

UNITED WISCONSIN SERVICES, INC., *et al.*, on behalf of themselves and all others similarly situated,

    Plaintiffs,

 - against -

HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF WISCONSIN

Local Case No.: 99-CV-389

Michigan No.: 99-CV-73666

FILED
2001 JUL -6  P 3:49
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

## COORDINATED THIRD AMENDED CLASS ACTION COMPLAINTS

Plaintiffs, on behalf of themselves and all others similarly situated, in this, their

Coordinated Third Amended Class Action Complaints, seek declaratory relief, damages, both

actual and treble, and equitable relief in the nature of disgorgement and/or restitution, for

defendants' violations of state statutes proscribing unfair methods of competition and unfair trade

practices and/or under common law principles of unjust enrichment. For the convenience of the

parties and the Court, plaintiffs assert their claims in one coordinated pleading and make their

individual prayers for relief at the end.  Plaintiffs allege, upon knowledge as to themselves and

their own acts, and upon information and belief as to all other matters, as follows:

## I.   ALLEGATIONS COMMON TO ALL<br>COMPLAINTS -- SUMMARY OF ALLEGATIONS

1.      Defendant Hoechst Marion Roussel ("HMR"), a wholly owned subsidiary of

defendant Hoechst Aktiengesellschaft ("Hoechst"), is the manufacturer of the brand name

prescription heart drug, Cardizem CD, consisting of a once-daily dosage of the chemical

compound diltiazem hydrochloride.  Cardizem CD is prescribed for the treatment of chronic

chest pains (angina), high blood pressure (hypertension), and prevention of heart attacks and

strokes.

2.      Until June 23, 1999, when defendant Andrx Pharmaceuticals, Inc. ("Andrx")

began to sell Cartia XT, the generic bioequivalent to Cardizem CD, HMR made 100% of U.S.

sales of Cardizem CD and its generic bioequivalents, because there were no generic

bioequivalent versions of Cardizem CD available in the United States.

3.      Beginning at least as early as 1992, Hoechst and HMR engaged in a continuing

pattern of unlawful anticompetitive conduct, including combinations, conspiracies and trusts,

with co-defendants and others, in restraint of trade in the United States markets for Cardizem CD

and its generic bioequivalents, the sole purpose of which has been to delay the introduction of a

generic bioequivalent version of Cardizem CD in the United States, and thereby prolong HMR's

Cardizem CD monopoly.  The targets of HMR's conduct have included, at varying times, co-

defendant Andrx and Hoechst's former joint venture partner, Biovail International Corporation

("Biovail").  The methods used by HMR and Hoechst and their predecessors (the "Hoechst

Defendants") have included prosecution of baseless patent infringement actions, breach of

agreements with Biovail, misrepresentations made to the United States Food & Drug

Administration (the "FDA"), and disregard of a consent decree with the United States Federal

Trade Commission (the "FTC") which was expressly designed to prevent the very

anticompetitive trade practices in which the Hoechst Defendants have continued to engage.

4.      On September 24, 1997, eight days after the FDA preliminarily approved Cartia

XT as the first AB-rated generic bioequivalent for Cardizem CD, HMR entered into a written

contract with defendant Andrx, its prospective horizontal competitor, to allocate HMR's

Cardizem CD monopoly between them and ensure that no other company could introduce a

generic version of Cardizem CD in the United States.  Pursuant to this agreement, HMR agreed

to pay Andrx up to $100 million annually <u>not</u> to market Andrx's generic bioequivalent version of

Cardizem CD, and to block other drug manufacturers from introducing their own generic

bioequivalent versions of Cardizem CD in the United States (the "Hoechst-Andrx Agreement").

5.      After plaintiffs initiated these actions (first filed in August 1998), defendants'

illegal contract and conspiracy was widely publicized in the media, condemned by public

officials and health care payers injured by defendants' acts, and investigated by the FTC, resulting

in HMR's and Andrx's termination of their contract in June 1999 and Andrx's immediate market

launch of Cartia XT.

6.      The effects of the foregoing illegal acts by defendants have been to prolong the

monopoly enjoyed by HMR in the annual $700-million-plus United States market for Cardizem

CD and its generic bioequivalents, thereby prolonging the Hoechst Defendants' ability to fix the

price of Cardizem CD at supra-competitive levels while retaining 100% market share, free from

the stabilizing forces of generic competition.  For its role in this illicit deal, HMR paid Andrx

$89,863,013.48 pursuant to the Hoechst-Andrx Agreement.

7.      Through such illegal and inequitable acts, defendants have enriched themselves unjustly at the expense of, and caused damages to, plaintiffs, individual Cardizem CD and Cartia XT users, and managed-care "third-party payers" (including self-funded employers) (collectively, "end payers"), who, collectively, pay for almost the entire cost of Cardizem CD and Cartia XT sold in the jurisdictions in which these actions have been filed -- Alabama, California, the District of Columbia, Illinois, Michigan, Minnesota, New York, North Carolina, Tennessee, and Wisconsin (which, together with Arizona, Maine, Massachusetts, Nevada, New Mexico, Puerto Rico, and West Virginia, are referred to collectively, as the "Indirect Purchaser States") -- and elsewhere throughout the United States.

## II.      ALLEGATIONS COMMON TO ALL COMPLAINTS -- JURISDICTION AND VENUE

8.      Plaintiffs filed each of their respective complaints in state courts.  Defendants removed all of these cases to their respective federal district courts pursuant to 28 U.S.C. § 1441, *et seq.*, which removals plaintiffs assert were improper.   Defendants assert that there is federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), and diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  To the extent the transferor federal district courts had subject matter jurisdiction over their respective removed cases, the United States District Court for the Eastern District of Michigan has multidistrict pretrial jurisdiction over each of these actions pursuant to 28 U.S.C. § 1407, the initial transfer order of the Judicial Panel on Multidistrict Litigation ("Multidistrict Panel") entered on June 11, 1999, and conditional transfer orders of the Multidistrict Panel entered thereafter.  Although plaintiffs maintain there is no basis for federal subject matter jurisdiction, with the exception of Lightner, *et al.*, v. Hoechst Aktiengesellschaft, *et al.*, and Marshall J. Ross v. Hoechst Marion Roussel, Inc., *et al.*, their motions to remand to

1369 / CMP / 00050022.WPD v1                              4

their respective states' courts have been denied, and the current law of the case in each action is

that federal subject matter jurisdiction is present.

### III.     ALLEGATIONS UNIQUE TO THEIR RESPECTIVE COMPLAINTS -- THE PLAINTIFFS

9.     Plaintiffs are purchasers of Cardizem CD and its AB-rated generic bioequivalents

("generic bioequivalents") in the Indirect Purchaser States.

(a.)     **ALABAMA PLAINTIFFS (Michigan Case No. 99-CV-75070)**

(i)     Plaintiff Billy Joe Lightner ("Lightner") is a resident of Clayton,

Alabama.  During the relevant period, Lightner paid dispensing pharmacies in Alabama to fill his

prescriptions for Cardizem CD.  For some of these purchases, Lightner paid 20% and his third

party payer paid 80% of the retail cost.

(ii)     Plaintiff Lomax Stanford ("Stanford") is a resident of Clio,

Alabama.  Stanford suffers from angina and hypertension.  After his first heart attack, beginning

in January 1998, pursuant to his doctor's prescription, Stanford paid, without third-party co-

payment, dispensing pharmacies in Alabama approximately $75 per month to fill his

prescriptions for 240-mg Cardizem CD.

(iii)     Plaintiff Janoka, Inc., d/b/a The Medicine Shoppe ("Janoka"), is an

Alabama corporation with its principal place of business in Barbour County, Alabama.  Janoka

operates a retail pharmacy and purchases Cardizem CD in the normal course of business from

drug wholesalers for resale pursuant to doctors' prescriptions.  For the period of January 1998 to

the present with respect to Cardizem CD, and subsequent to June 1999 to the present for Cartia

XT, Janoka has regularly purchased capsules of such drugs in large lots and dispensed such

capsules pursuant to doctors' prescriptions, typically in 30-, 60-, or 90-day lots.  Typical of

pharmacies, which are government-regulated, Janoka keeps accurate records of its purchases and sales of Cardizem CD and Cartia XT.

          (iv)    Plaintiff Fredrick Mark Flegal ("Flegal") is a resident of Huntsville, Alabama.  During the relevant period, Flegal co-paid dispensing pharmacies in Alabama approximately $15 per prescription for 90-day supplies of Cardizem CD, with the balance co-paid by his managed care provider.

         (b)(i)  **CALIFORNIA PLAINTIFFS**  **(Betnor; Morris; Aetna) (Michigan Case No. 99-CV-73412)**

          (1)    Plaintiff Betnor, Inc., d/b/a Reliable Drug Store ("Betnor"), is a California corporation with its principal place of business in Tustin, California.  Betnor operated a retail pharmacy until it discontinued operations in September 1999.  Prior thereto, Betnor regularly purchased Cardizem CD and, after June 1999, Cartia XT, in the normal course of business from drug wholesalers for resale pursuant to doctors' prescriptions.

          (2)    Plaintiff Betty Morris ("Morris") is a resident of Tustin, California.  During the relevant period, Morris co-paid approximately $20 per month to dispensing pharmacies in California to fill her prescriptions for Cardizem CD, and subsequent to June 1999, approximately $10 per month for Cartia XT, with the balance co-paid by her managed care provider.

          (3)    Plaintiff Aetna U.S. Healthcare, Inc., now known as Aetna Inc., is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania. Aetna, Inc. and/or its subsidiaries (collectively, "Aetna") provides health payment benefits to over 23 million (23,000,000) people and has agreements with over 46,000 participating pharmacies in the United States, covering every state and territory in the United States and the District of Columbia.  Subject to the terms and conditions of the managed care agreements

covering such members, Aetna pays or co-pays the cost of most health services and products used by such members, including prescription drugs (including Cardizem CD and Cartia XT). In California, Aetna pays to pharmacies all or part of the cost of prescription drugs dispensed to thousands of Aetna members. Since the beginning of the class periods (defined below), Aetna has paid dispensing pharmacies in the United States in excess of $40 million for Cardizem CD for Aetna members, covering every state and territory in the United States and the District of Columbia.

(4)     Plaintiff Aetna U.S. Healthcare of California, Inc., a wholly owned subsidiary of Aetna, is a California corporation with a certificate of authority to conduct business in the State of California and has offices throughout the State of California.

ii.     **CALIFORNIA PLAINTIFFS** **(Galloway; Merit Aid)**
        **(Michigan Case No. 99-CV-73871)**

(1)     Plaintiff Galloway, Inc. ("Galloway") is a California corporation with its principal place of business in San Diego, California. Galloway operates a retail pharmacy and throughout the relevant period has purchased Cardizem CD and, subsequent to June 1999, Cartia XT, in the normal course of business from drug wholesalers for resale pursuant to doctors' prescriptions.

(2)     Plaintiff Merit Aid Pharmacy & Medical Supply, Inc. ("Merit Aid") is a California corporation with its principal place of business in Van Nuys, California. Merit Aid operates a retail pharmacy and throughout the relevant period has purchased Cardizem CD and, subsequent to June 1999, Cartia XT, in the normal course of business from drug wholesalers for resale pursuant to doctors' prescriptions.

(c)     **DISTRICT OF COLUMBIA PLAINTIFF (Michigan Case No. 99-CV-74262)**

(i)     Plaintiff Aetna U.S. Healthcare, Inc., now known as Aetna Inc., is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania. Aetna, Inc. and/or its subsidiaries (collectively, "Aetna") provides health payment benefits to over 23 million (23,000,000) people and has agreements with over 46,000 participating pharmacies in the United States, covering every state and territory in the United States and the District of Columbia. Subject to the terms and conditions of the managed care agreements covering such members, Aetna pays or co-pays the cost of most health services and products used by such members, including prescription drugs (including Cardizem CD and Cartia XT). In the District of Columbia, Aetna pays to pharmacies all or part of the cost of prescription drugs dispensed to thousands of Aetna members. Since the beginning of the class periods (defined below), Aetna has paid dispensing pharmacies in the United States in excess of $40 million for Cardizem CD and its generic bioequivalents for Aetna members, covering every state and territory in the United States and the District of Columbia.

(d)     **ILLINOIS PLAINTIFF (Michigan Case No. 99-CV-73667)**

(i)     Plaintiff Jan Gabriel ("Gabriel") is a resident of Illinois. During the class periods, Gabriel paid dispensing pharmacies in Illinois to fill his prescriptions for Cardizem CD.

(e)     **MASSACHUSETTS PLAINTIFF (Massachusetts Case No.00-CV-12312)**

(i)     Plaintiff Marshall J. Ross ("Ross") is a resident of Swampscott, Massachusetts. During the relevant period, Ross paid dispensing pharmacies in Massachusetts to fill his prescriptions for Cardizem CD.

(f)      **MICHIGAN PLAINTIFFS** (Zuccarini; Aetna) **(Michigan Case No. 98-CV-74043)**

(i)      Plaintiff Charles Zuccarini ("Zuccarini") is a resident of Northville, Michigan.   During the relevant period, Zuccarini has paid, without co-payment, dispensing pharmacies to fill his prescriptions for Cardizem CD and Cartia XT.

(ii)      Plaintiff Aetna U.S. Healthcare, Inc., now known as Aetna Inc., is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania. Aetna, Inc. and/or its subsidiaries (collectively, "Aetna") provides health payment benefits to over 23 million (23,000,000) people and has agreements with over 46,000 participating pharmacies in the United States, covering every state and territory in the United States and the District of Columbia.   Subject to the terms and conditions of the managed care agreements covering such members, Aetna pays or co-pays the cost of most health services and products used by such members, including prescription drugs (including Cardizem CD and Cartia XT).   In Michigan, Aetna pays to pharmacies all or part of the cost of prescription drugs dispensed to thousands of Aetna members.   Since the beginning of the class periods (defined below), Aetna has paid dispensing pharmacies in the United States in excess of $40 million for Cardizem CD and its generic bioequivalents for Aetna members, covering every state and territory in the United States and the District of Columbia.

(g)      **MINNESOTA PLAINTIFF** **(Michigan Case No. 99-CV-73239)**

(i)      Plaintiff Aetna U.S. Healthcare, Inc., now known as Aetna Inc., is a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania. Aetna, Inc. and/or its subsidiaries (collectively, "Aetna") provides health payment benefits to over 23 million (23,000,000) people and has agreements with over 46,000 participating pharmacies in the United States, covering every state and territory in the United States and the

District of Columbia.  Subject to the terms and conditions of the managed care agreements

covering such members, Aetna pays or co-pays the cost of most health services and products

used by such members, including prescription drugs (including Cardizem CD and Cartia XT).  In

Minnesota, Aetna pays to pharmacies all or part of the cost of prescription drugs dispensed to

thousands of Aetna members.  Since the beginning of the class periods (defined below), Aetna

has paid dispensing pharmacies in the United States in excess of $40 million for Cardizem CD

and its genetic bioequivalents for Aetna members, covering every state and territory in the United

States and the District of Columbia.

(h)(i)   **NEW YORK PLAINTIFFS (D'Esposito; Aetna) (Michigan Case No.
99-CV-73845)**

(1)      Plaintiff Joseph D'Esposito ("D'Esposito") is a resident of New

Hyde Park, New York.  During the relevant period, D'Esposito co-paid dispensing pharmacies in

New York to fill his prescriptions for Cardizem CD, with the balance co-paid by his managed

care provider.

(2)      Plaintiff Aetna U.S. Healthcare, Inc., now known as Aetna Inc., is

a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania.

Aetna, Inc. and/or its subsidiaries (collectively, "Aetna") provides health payment benefits to

over 23 million (23,000,000) people and has agreements with over 46,000 participating

pharmacies in the United States, covering every state and territory in the United States and the

District of Columbia.  Subject to the terms and conditions of the managed care agreements

covering such members, Aetna pays or co-pays the cost of most health services and products

used by such members, including prescription drugs (including Cardizem CD and Cartia XT).  In

New York, Aetna pays to pharmacies all or part of the cost of prescription drugs dispensed to

thousands of Aetna members.  Since the beginning of the class periods (defined below), Aetna

has paid dispensing pharmacies in the United States in excess of $40 million for Cardizem CD

and its generic bioequivalents for Aetna members, covering every state and territory in the United

States and the District of Columbia.

      (ii)  **NEW YORK PLAINTIFF (Sunshine Pharmacy) (Michigan Case No. 99-CV-73713)**

      (1)    Plaintiff Sunshine Pharmacy of New York ("Sunshine") is a New

York corporation with its principal place of business located in New York. Sunshine operated a

retail pharmacy and purchased Cardizem CD and, subsequent to June 1999, Cartia XT, in the

normal course of business from drug wholesalers for resale pursuant to doctors' prescriptions.

      (i)  **NORTH CAROLINA PLAINTIFFS (Glover; Aetna) (Michigan Case No. 99-CV-74377)**

      (i)    Plaintiff Shirlean Glover ("Glover") is a resident of North Carolina.

From May 1997 through September 1999, Glover co-paid dispensing pharmacies in North

Carolina $14 per month to fill her prescriptions for Cardizem CD, with the balance co-paid by

her managed care provider, Principal Health Care. Beginning October 1999, Glover has paid

$7.00-$10.00 co-payments for Cartia XT, with the balance co-paid by Principal Health Care.

      (ii)    Plaintiff Aetna U.S. Healthcare, Inc., now known as Aetna Inc., is

a Pennsylvania corporation with its principal place of business in Blue Bell, Pennsylvania.

Aetna, Inc. and/or its subsidiaries (collectively, "Aetna") provides health payment benefits to

over 23 million (23,000,000) people and has agreements with over 46,000 participating

pharmacies in the United States, covering every state and territory in the United States and the

District of Columbia. Subject to the terms and conditions of the managed care agreements

covering such members, Aetna pays or co-pays the cost of most health services and products

used by such members, including prescription drugs (including Cardizem CD and Cartia XT). In

North Carolina, Aetna pays to pharmacies all or part of the cost of prescription drugs dispensed to thousands of Aetna members. Since the beginning of the class periods (defined below), Aetna has paid dispensing pharmacies in the United States in excess of $40 million for Cardizem CD and its generic bioequivalents for Aetna members, covering every state and territory in the United States and the District of Columbia.

(j)(i)   **TENNESSEE PLAINTIFF** (Sams) **(Michigan Case No. 99-CV-73345)**

(1)   Plaintiff Eugenia Wynne Sams ("Sams") is a resident of Tennessee. During the relevant period, Sams co-paid dispensing pharmacies in Tennessee to fill her prescriptions for 120-mg Cardizem CD, with the balance paid by her managed care provider, Blue Cross/Blue Shield.

(ii)   **TENNESSEE PLAINTIFF** (Sizemore) **(Michigan Case No. 99-CV-73666)**

(1)   Plaintiff Larry S. Sizemore ("Sizemore") is a resident of Nashville, Tennessee. Since 1998, Sizemore co-paid dispensing pharmacies in Tennessee approximately $16 per month to fill his prescriptions for 240-mg Cardizem CD, with the balance (approximately $57) co-paid by his managed care provider.

(k)   **WISCONSIN PLAINTIFFS (Michigan Case Nos. 99-CV-73981; 99-CV-73666)**

(1)   Plaintiff United Wisconsin Services, Inc., now known as Cobalt Corporation ("United Wisconsin"), is a Wisconsin corporation with its principal place of business at 401 West Michigan Street, Milwaukee, Wisconsin. United Wisconsin provides health payment benefits to approximately two million persons in all 50 states through various subsidiaries and affiliates, including Blue Cross and Blue Shield of Wisconsin, Inc., Compcare Health Insurance Corporation, Unity Health Plans Insurance Corporation and Valley Health Plan

Incorporated. United Wisconsin provides health care benefits for over 600,000 Wisconsin residents, including prescription drug coverage to over 400,000 of these Wisconsin residents. Through agreements administered through participating pharmacies, United Wisconsin has during, the class periods (defined below), paid or co-paid over $600,000 to pharmacies for the cost of prescriptions for Cardizem CD and its generic bioequivalents dispensed to persons covered by United Wisconsin plans.

(2) Plaintiff Albert Eirich ("Eirich") is a resident of Sheboygen Falls, Wisconsin. Since 1997, Eirich paid dispensing pharmacies in Wisconsin the full retail price to fill his prescriptions for Cardizem CD.

## IV.   ALLEGATIONS COMMON TO ALL COMPLAINTS -- DEFENDANTS

### A. The Hoechst Defendants

10. Defendant Hoechst, now known as Aventis, was, at the time these actions were commenced, organized under the laws of the Federal Republic of Germany with its executive offices at 65926 Frankfurt-am-Main, Germany. Hoechst is the holding company for a conglomerate of international subsidiaries and affiliates with sales in excess of 34 billion dollars ($34,000,000,000) in 1998, including United States sales of Cardizem CD in 1998 in excess of seven hundred million dollars ($700,000,000). Hoechst's securities are traded publicly throughout the United States, including all of the Indirect Purchaser States, through the facilities of the New York Stock Exchange, under the company's new name: "Aventis." Hoechst maintains U.S. offices at 3 Park Avenue, New York, New York, and conducts extensive business throughout the United States through its wholly owned U.S. subsidiaries, including HMR. The capital stock of HMR is owned by HMR Pharma, a Delaware corporation and Hoechst Marion

Roussel S.A., a French corporation.  These two companies are wholly-owned subsidiaries of

Hoechst Marion Roussel AG, a German concern which is, in turn, wholly-owned by Hoechst.

11.     On or about June 25, 1995, defendant Hoechst bought Marion Merrell Dow, Inc.

("Dow"), a major U.S. pharmaceutical company, at a cost of more than seven billion U.S. dollars

($7,000,000,000).  Dow's best-selling prescription drug product was Cardizem CD.  After the

acquisition, Dow's name was changed to "Hoechst Marion Roussel, Inc." and more recently to

"Aventis Pharmaceuticals, Inc." ("HMR").  HMR is a Delaware corporation with its principal

place of business, at the time these actions were commenced, at 10236 Marion Park Drive,

Kansas City, Missouri, and recently, in Parsippany, New Jersey.  Until recently, HMR was

responsible, among other things, for developing, distributing, advertising and selling Cardizem

CD throughout the United States.   In January 2001, HMR announced that, as of January 1, 2001,

it had sold the North American rights to the Cardizem product lines to Biovail for $409,500,000,

with HMR continuing to manufacture the products for Biovail.

12.     Hoechst, through HMR, regularly transacts business throughout every state in the

United States, including the promotion, marketing and sale of prescription drugs.

13.     Hoechst controls the board of directors and business operations of HMR,

including HMR's pharmaceutical business in the United States.  Representatives of Hoechst had

ultimate decision-making authority for all negotiations and decisions relevant to the allegations

in these complaints, including the repudiation of its obligations under the consent decree with the

FTC (*see infra*); revocation of the FDA right of reference given to Biovail (*see infra*); and the

authorization of the Hoechst-Andrx Agreement.  The Board of Directors of Hoechst Marion

Roussel AG (many of whose members overlapped with the Board of Directors of Hoechst)

approved HMR's execution of the Hoechst/Andrx Agreement (*see infra*) in August 1997.

14.     Defendant Carderm Capital L.P. ("Carderm") is a Delaware limited partnership with its principal place of business in Hamilton, Bermuda. Carderm was formed by HMR as a tax avoidance strategy. Carderm is directly or indirectly owned or controlled by Hoechst and HMR, whose indirect wholly owned subsidiary, Marion Merrell (Europe) AG, is Carderm's general partner. Carderm held the rights to three patents relating to Cardizem CD.

## B. Andrx

15.     Defendant Andrx is a Florida corporation with its principal place of business in Fort Lauderdale, Florida. Andrx is a publicly traded company whose stock is listed on the NASDAQ National Market Systems. Andrx develops, manufactures and markets controlled-release drugs. Andrx does business throughout the United States through its distribution subsidiary, Anda Generics, which sells generic drugs to pharmacies.

16.     Andrx developed a generic bioequivalent to Cardizem CD, recently marketed under the trade name Cartia XT, which was preliminarily approved by the FDA for sale in the United States in September 1997 and given final FDA approval in July 1998, and which Andrx had *licensed for sale in Canada* before June 1999. However, pursuant to the illegal contract, conspiracy and combination, the Hoechst Defendants paid Andrx $89.86 million ($89,860,000) *not to sell* Cartia XT "or other bioequivalent or generic version of Cardizem CD in the United States directly or indirectly" before June 1999, and to use its FDA first filer status to block other manufacturers from introducing generic bioequivalents to Cardizem CD in the United States.

## V.     ALLEGATIONS COMMON TO ALL COMPLAINTS --
## CLASS ACTION ALLEGATIONS

17.     Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, plaintiffs bring their respective antitrust, consumer protection and unjust enrichment actions on behalf of state-wide classes consisting of all persons and entities who or which have paid and/or co-paid

pharmacies (including mail-order pharmacies) to dispense Cardizem CD and its generic

bioequivalents to patients residing in the Indirect Purchaser States during the Conspiracy Class

Period or the Monopolization Class Period.  Michigan Plaintiffs also bring their unjust

enrichment claims on behalf of all persons and entities who or which have paid and/or co-paid

pharmacies (including mail-order pharmacies) to dispense Cardizem CD and Cartia XT to

patients residing in the United States during the Conspiracy Class Period or the Monopolization

Class Period.

        a.      The "Conspiracy Class Period" is defined as July 9, 1998 through such

time that the effects of the Hoechst Defendants and Andrx's agreement and conspiracy to

delay competition have been ameliorated through competition unaffected by defendants'

illegal, unjust and unfair business practices.

        b.      The "Monopolization Class Period" is defined as commencing on the

earlier of the date following the Hoechst Defendants' November 8, 1996 withdrawal of

their letter of reference (*see infra*) that Biovail could otherwise have begun commercially

marketing a generic bioequivalent of Cardizem CD or September 15, 1997, the date the

FDA preliminarily approved Andrx's generic bioequivalent of Cardizem CD, and

continuing through such time that the effects of defendants' anticompetitive conduct

which delayed the entry of generic competition to Cardizem CD have been ameliorated

through competition unaffected by the Hoechst Defendants' illegal and unfair business

practices.

18.      a.      Included in the classes are end payers who have paid and/or co-paid supra-

competitive prices for the fulfillment of their own or third parties' prescriptions for Cardizem CD

and its generic bioequivalents in each of the Indirect Purchaser States and Cardizem CD and

Cartia XT throughout the United States. All such persons and entities are included in the term "end payers" for purposes of this Complaint.

b.      Excluded from the classes are defendants; their officers and directors; their direct and indirect parent and subsidiary corporations and their officers and directors; entities which purchased Cardizem CD and its generic bioequivalents for resale to the extent of such purchases for resale; and direct purchasers of Cardizem CD and Cartia XT from defendants, to the extent of such direct purchases.

c.      Also excluded from the classes with respect to any claims for relief asserted herein are natural persons who are citizens of states (other than Michigan[1]) whose state attorneys general (a) possess <u>parens patriae</u>, or equivalent, legal authority, to prosecute such claims on behalf of such persons, and (b) have asserted such authority in the action styled <u>State of New York, et al.</u> v. Aventis S.A., Case No. 01-71835 (USDC/EDMI) (NGE).

19.      The members of the national class and the respective state-wide classes are so numerous that joinder of all members is impracticable. Plaintiffs believe the Indirect Purchaser States' Cardizem CD end payers number in the hundreds of thousands, with a substantial portion of the approximately 13 million (13,000,000) annual U.S. prescriptions for Cardizem CD and its generic bioequivalents accounted for by end payers in every state.

20.      Defendants' illegal and inequitable methods, acts and trade practices have targeted and affected all members of the classes in a similar manner, *i.e.*, they overpaid for Cardizem CD due to the absence of competing FDA-approved AB-rated generic versions of Cardizem CD in the marketplace, and have paid and will continue to pay supra-competitive prices for Cardizem CD and its generic bioequivalents until the prices of Cardizem CD and its generic bioequivalents

_____

[1]The Court certified a class of Michigan end payers in Order No. 25 dated April 3, 2001.



stabilize from market saturation, which has been illegally and unfairly delayed by defendants. Among the questions of law and fact common to the classes are:

       a.      Whether, under common principles of antitrust and trade practice laws, defendants' methods, practices and acts, as alleged *infra*, including, but not limited to, the Hoechst-Andrx Agreement, violated the applicable laws of the respective Indirect Purchaser States;

       b.      Whether defendants' acts, contract, combination and conspiracy restrained competition for the sale of Cardizem CD and its generic bioequivalents and prevented or delayed introduction of any AB-rated generic version of Cardizem CD in the United States;

       c.      Whether, under common principles of antitrust laws, the Hoechst-Andrx Agreement constitutes a *per se* violation of each of the respective Indirect Purchaser States' applicable laws or is properly analyzed under the "rule of reason" standard[2];

       d.      Whether, if a "rule of reason" analysis is appropriate, under common principles of antitrust laws, the Hoechst Defendants had monopoly power over the relevant markets for Cardizem CD and its generic bioequivalents;

       e.      Whether, if a "rule of reason" analysis is appropriate, under common principles of antitrust laws, the United States market for Cardizem CD and its generic bioequivalents is a relevant market, judged from the viewpoint of the classes;

---

[2]Order No. 13 of this Court, dated June 6, 2000, held that the Hoechst/Andrx Agreement is a *per se* violation of all applicable antitrust statutes. That order is currently on appeal to the United States Court of Appeals for the Sixth Circuit.

f.      Whether, under common principles of antitrust laws, plaintiffs and the classes suffered antitrust injury for purposes of their claims under each of the respective Indirect Purchaser States' applicable laws;

g.      Whether, under common principles of antitrust laws, defendants' acts complained of constituted threats and/or attempts and/or conspiracies to monopolize the market for Cardizem CD and its generic bioequivalents under each of the respective Indirect Purchaser States' applicable laws;

h.      Whether, and the amount by which, defendants' illegal, inequitable and unfair trade practices have inflated the prices paid by members of the Classes for Cardizem CD and its generic bioequivalents over the amounts they would have paid in a competitive market unaffected by defendants' illegal acts; and

i.      Whether, under common principles of unjust enrichment, defendants unjustly enriched themselves to the detriment of plaintiffs and the classes, entitling plaintiffs and the classes to disgorgement to them of all benefits derived therefrom, including the $89,860,000 paid by the Hoechst Defendants to Andrx.

21.     Plaintiffs' claims are typical of those of the respective classes they represent, because plaintiffs and all of the class members sustained damages in the same way arising out of defendants' illegal and unfair methods, acts and practices and wrongful conduct in the conspiracy complained of herein, *i.e.*, they have paid and continue to pay supra-competitive prices, until the market for generic bioequivalents of Cardizem CD is no longer affected by defendants' illegal acts.

22.     Plaintiffs' claims are peculiarly susceptible to class action treatment due to the high degree of regulation, standardization, and record-keeping which characterize the prevalent

managed-care health care environment and the sale of prescription drugs through each level of distribution.

23.     Plaintiffs will fully and adequately protect the interests of all members of the respective classes they represent.  Plaintiffs have retained and this Court has appointed counsel who are experienced in class action and unfair trade practice litigation.  Plaintiffs have no interests which are adverse to or in conflict with other members of the respective classes.

24.     The questions of law and fact common to the members of the respective classes predominate over any questions which may affect only individual members.

25.     Class actions are superior to all other available methods for the fair and efficient adjudication of these controversies.  Plaintiffs know of no difficulty to be encountered in the management of these actions that would preclude their maintenance as class actions.  Indeed, under the prevalent managed-care health care environment, the detailed record-keeping prevalent at every level of prescription drug distribution makes these class actions more manageable than most.

## VI.   ALLEGATIONS COMMON TO ALL COMPLAINTS --
### FEDERAL REGULATION OF THE PHARMACEUTICAL BUSINESS

26.     Under the Federal Food, Drug, and Cosmetic Act ("FD&C Act") (21 U.S.C. § 301 *et seq*.), approval by the FDA is required before a company may begin selling a new drug. Premarket approval for a new drug, often referred to as a "pioneer drug", must be sought by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use.

27.     New drugs that are approved for sale in the United States by the FDA are typically covered by patents, which provide the patent owner with the exclusive right to sell that new or pioneer drug in the United States for the duration of the patents involved, plus any extension of

the original patent period ("FDA Exclusivity Period") granted pursuant to the Drug Price

Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 355 ("Hatch-

Waxman Act").

28.    Generic drugs are drugs which the FDA has found to have the same active

chemical composition and provide the same therapeutic effects as the pioneer, brand-name drugs

(sometimes called a "reference listed drug" or "RLD").  Where a generic drug is completely

equivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an AB rating.

29.    Once the safety and effectiveness of a new drug is approved by the FDA, it may

be used in the United States only under the direction and care of a doctor who writes a

prescription, specifying the drug by name, which must be purchased from a licensed pharmacist.

The pharmacist must, in turn, fill the prescription with the drug brand specified by the physician,

unless an AB-rated generic version of that pioneer drug which has been approved by the FDA is

available.

30.    However, if a generic version of a brand-name drug exists and the physician has

not specifically indicated on the prescription "DAW" or "dispense as written" (or similar

indications, the wording of which varies slightly from state to state), then:  (a) for consumers

covered by most managed care plans, the pharmacist will substitute the generic drug; and (b) for

consumers whose purchases are not covered by managed care plans, the pharmacist will offer the

consumer the choice of purchasing the AB-rated generic at a lower price.

31.    Accordingly, once a doctor writes a prescription for a brand-name drug such as

Cardizem CD, that prescription defines and limits the market available to consumers, third-party

payers, and pharmacies, to the drug named or its AB-rated generic equivalent.  Only drugs which

carry the FDA's "AB" generic rating may be substituted by a pharmacist for a doctor's

prescription for a pioneer drug.  Cartia XT was the first QD Diltiazem drug available for use in the United States which is an AB-rated generic substitute for Cardizem CD.

32.     The FDA's AB rating is not issued liberally.  The FDA may approve for marketing a drug with the same active chemical composition as a pioneer drug, but withhold the AB rating. Indeed, there are several drugs which attempt to imitate Cardizem CD therapeutically, containing the identical amount of the active chemical, diltiazem hydrochloride, in a once-daily dosage form ("QD Diltiazem"), but upon which the FDA has not bestowed an AB rating.

33.     Due to defendants' illegal and unfair methods, acts and practices and restraints of trade, no AB-rated generic version of Cardizem CD was available in the United States until Hoechst and Andrx terminated the Hoechst-Andrx Agreement on June 9, 1999.  Until that time, prescriptions for Cardizem CD could only be filled in United States with the Hoechst Defendants' drug.

34.     Generic drugs are invariably priced below the branded drugs to which they are bioequivalent.  Typically, the first AB-rated generic is introduced at a substantial discount to the branded drug, followed by increasingly steeper discounts, as more companies come out with competing generics.  Prices of the branded drugs are also constrained by generic competition. The beneficiaries of this price competition are all purchasers of the branded drug and/or its generic equivalent.  Third-party payers encourage use of FDA-approved AB-rated generic bioequivalents by, among other things, requiring lower co-payments from patients who receive such generics than the co-payments they must pay for equivalent branded drugs, by limiting the amount they will pay pharmacies for the brand name drug or its generic bioequivalent to a single price based upon the lower price of a generic bioequivalent, and by paying higher dispensing fees to pharmacies for filling prescriptions with such generics.

35.     The branded pioneer drug ordinarily loses most of its market share to generic competitors within a relatively short time after the introduction into the market of a generic equivalent, unless it adjusts its prices to meet competition.  Either way, end payers benefit from the competition.

## Drug Applications For Generic Drugs

36.     The Hatch-Waxman Amendments to the FD&C Act, 21 U.S.C. 355(j), provide that a party seeking FDA approval of a generic version of a patented drug may, in certain circumstances, file an Abbreviated New Drug Application ("ANDA") relying on the safety and efficacy data filed with the FDA relating to that pioneer drug.  The ANDA process was designed to expedite FDA approval and market entry of safe, effective, and lower-priced AB-rated generic versions of pioneer drugs.

## Paragraph IV ANDA Certifications

37.     Where the patents on a branded drug have not expired, the generic ANDA applicant must notify the owner of the pioneer drug of the filing of its ANDA and certify, when appropriate, that the patents covering the pioneer drug (listed in the FDA "Orange Book") are either invalid or not infringed by its generic version of that product ("Paragraph IV Certification").

## The Drug Patent Holder's Ability To Delay
## Paragraph IV ANDA Applications for Up To 30 Months

38.     The pioneer drug owner, upon receiving a Paragraph IV Certification from an ANDA applicant, has 45 days to initiate a patent infringement suit against the applicant.  If no action is initiated within 45 days, the process for FDA approval of the generic product is not delayed by patent issues.  However, if a patent infringement suit is brought within the 45-day window, FDA approval of the ANDA is automatically postponed until the earliest of the

expiration of the patents, the expiration of 30 months from the patent holder's receipt of notice of

the Paragraph IV Certification, or a decision of a court holding the patent which is the subject of

the Paragraph IV Certification to be invalid or not infringed.

39.     Accordingly, pioneer drug patent holders need only to file a patent infringement

lawsuit within 45 days of receipt of a Paragraph IV certification in order to block an ANDA

applicant's generic drug from entering the market for up to 30 months.

40.     In what has become a widespread abusive and unfair business practice, pioneer

drug patent holders whose drugs have significant sales and no AB-rated generic equivalent have

routinely exploited this option in bad faith by (a) improperly obtaining and ultimately listing in

the Orange Book numerous patents of little merit but with expiration dates long after the

expiration date of the patent for the active ingredient (here, QD Diltiazem), and (b) initiating

patent infringement suits within the 45-day window against virtually every ANDA filer,

irrespective of the merits of the suits and without significant risk of any meaningful penalty

(when weighed against the rewards of perpetuating their monopolies) for a wrongful assertion.

Often, as is the case here, the meritless patents are first listed on the eve of an anticipated ANDA

application, and many of the ensuing patent lawsuits are brought with no reasonable basis or

belief that the pioneer drug patent holder will succeed on the merits, but rather, solely to delay

generic competition and prolong the pioneer drug patent holder's monopoly.  In most such cases,

the pioneer drug patent holder calculates that the generic company lacks the financial resources

to match the pioneer's litigation efforts or the ability to survive an adverse judgment.  In virtually

every case, regardless of the merits, these practices result in the pioneer holder extending its

monopoly for at least 30 months.  The results of this form of bad faith procedural gamesmanship

are that end payers are denied generic choice and the consequent ability to pay less for drug

formulations, long after the basic active drug ingredient patents have expired. The Hoechst

Defendants acted in exactly this manner to prolong their Cardizem CD monopoly.

**The 180-Day Exclusivity Period for the**
**First Paragraph IV Generic Drug Applicant**

41.     The Hatch-Waxman Act provides that the first applicant submitting an ANDA

with a Paragraph IV Certification for a generic version of a pioneer drug has a 180-day period of

marketing exclusivity before other ANDAs for the same generic drug can be approved by the

FDA. The 180-day period begins when the first ANDA applicant either (a) begins selling the

generic drug, or (b) obtains a court decision of non-infringement in a patent infringement suit,

whichever occurs first. Thus, the first generic ANDA applicant has the opportunity to compete

directly with the pioneer drug owner for 180 days without competition from other generic

producers.

**VII.     ALLEGATIONS COMMON TO ALL COMPLAINTS --**
**THE ECONOMIC MODEL OF PRESCRIPTION DRUG**
**PURCHASES AND SALES**

42.     A prescription drug is typically sold in capsule or tablet form through a

distribution chain of manufacturers to wholesalers to retail pharmacies which deliver the product

to an end consumer. The drug passes in unaltered form through the chain from manufacturer to

user. The retail price paid by end payers is directly and inextricably intertwined with the

wholesale prices charged by drug manufacturers, as the end payers are the source of drug

manufacturers' revenues and the targets of drug manufacturers' marketing actions, including

illegal and inequitable actions such as those described herein. This is the case with Cardizem CD

and its generic bioequivalents.

43.     Although a minority of consumers do not have third-party-payer health care

benefits, in approximately 80% of the cases the consumer is a dual payer, consisting of a health

benefits plan member and a third-party payer.  According to U.S. Census Bureau statistics for

1998, the estimated population of the Indirect Purchaser States, compared to the total United

States population, and percentage of citizens of the Indirect Purchaser States who had third-party

payer health benefits are as follows:

| State/District | Population | % of U.S. Population | % of Residents With Third-Party Payer Benefits |
|---|---|---|---|
| Alabama | 4,201,000 | 1.54 | 83.7 |
| Arizona | 4,905,000 | 1.80 | 75.8 |
| California | 33,375,000 | 12.28 | 77.9 |
| District of Columbia | 512,000 | 0.19 | 83.0 |
| Illinois | 12,295,000 | 4.52 | 85.0 |
| Maine | 1,266,000 | 0.47 | 87.3 |
| Massachusetts | 6,117,000 | 2.25 | 89.7 |
| Michigan | 10,041,000 | 3.70 | 86.8 |
| Minnesota | 4,833,000 | 1.78 | 90.7 |
| Nevada | 1,862,000 | 0.69 | 78.8 |
| New Mexico | 1,829,000 | 0.67 | 88.9 |
| New York | 18,420,000 | 6.78 | 82.7 |
| North Carolina | 7,427,000 | 2.73 | 85.0 |
| North Dakota | 646,000 | 0.02 | 85.8 |
| Tennessee | 5,572,000 | 2.05 | 87.0 |
| West Virginia | 1,750,000 | 0.67 | 86.8 |
| Wisconsin | 5,129,000 | 1.89 | 88.2 |

The success of defendants' conspiracy and unfair acts, practices and methods of illegal

monopolization has caused and will continue to cause (until full generic market saturation)

massive monetary damage to virtually all the end payers for Cardizem CD and its generic

bioequivalents dispensed in the United States.

44.     Since managed care became prevalent in the United States, prior to the beginning of the Class Periods, a manufacturer of a pioneer prescription drug has typically sold the drug in tablet or capsule form, ready for consumption, to wholesalers and large pharmacies at a discount to the manufacturer's "Average Wholesale Price" ("AWP"), which is a published price set by the manufacturer and widely available on a current basis from well-known data service providers. Wholesalers in turn typically sell the branded drug to retail pharmacies at a slightly smaller discount from AWP, thereby achieving a small percentage markup.

45.     Virtually all United States pharmacies have dispensing contracts with third-party payer plans. Pursuant to these contracts, for drugs dispensed to members of third-party payer plans, pharmacies typically charge the dual payers (the third-party payer and the member, *i.e.*, the patient using the drug) a retail price based on a percentage of AWP, plus a dispensing fee of $1.00-$2.50 per prescription. The pharmacies generally collect a co-payment (or deductible) from the members, which typically ranges from $5-$35 (with a lower co-payment for generic drugs), and the balance from the third-party payer.

46.     After AB-rated generic bioequivalents of a branded drug become readily available, third-party payers typically reduce the amount they will pay to the pharmacy to a price based upon the lower price of the available generic, sometimes called the Maximum Allowable Cost ("MAC").

47.     Thereafter, the third-party payer's members either accept the lower-priced generic (which generally also reduces the amount of his or her co-payment) or else pay a higher co-payment based upon the difference between the branded drug's retail price minus the third-party payer's MAC-based co-payment.

48.     Pharmacies pay substantially less for AB-rated generics than they pay for the branded equivalent drug and generally receive a higher dispensing fee (typically, approximately $.50-$1.00 more) from the third-party payers for dispensing generics than they receive for dispensing branded drugs.

49.     Some health benefit plan members have a dual-payment relation which, instead of a flat co-payment by the consumer, consists of the member paying a percentage of the prescription cost and the third-party payer paying the balance.

50.     For the minority of consumers without a third-party co-payer, the entire price of prescription drug is paid by such consumers.

## VIII.   ALLEGATIONS COMMON TO ALL COMPLAINTS --  DILTIAZEM HYDROCHLORIDE-BASED PRESCRIPTION DRUGS

51.     The pioneer new drug in the United States containing diltiazem hydrochloride as an active ingredient for treating hypertension and angina was Cardizem, introduced in the U.S. in 1982 by Dow, the predecessor of HMR.  Diltiazem hydrochloride is a distinctive form of "calcium channel blocker" ("CCB").  Hypertension and angina are chronic conditions that affect over 50 million Americans, many of whom are senior citizens.

52.     The original Cardizem product was in an immediate release dosage form. Immediate-release dosage did not allow for a continuing and slow release of diltiazem hydrochloride into the patient's bloodstream, and therefore, in order for the drug to have continuing benefits, patients were required to take three or four doses of Cardizem each day. Such a drug regimen is hard to follow and resulted in significant patient non-compliance, which can be dangerous when the condition being treated is chronic, such as hypertension or angina.

53.     HMR's predecessor, Dow, reformulated the original Cardizem product, utilizing a patented drug delivery system which provided for the controlled release of diltiazem

hydrochloride to the bloodstream. This made possible a twice-daily, sustained-release form of diltiazem product called Cardizem SR, which Dow introduced in 1989.

54.     In 1992, Dow introduced its once-a-day diltiazem hydrochloride formulation, under the name Cardizem CD. Cardizem CD's single administration of diltiazem hydrochloride over the course of a day is based on a sustained-release delivery method patented by Elan Corporation, P.L.C. ("Elan"), an Irish company.

55.     Because of its greater convenience, Cardizem CD rapidly replaced Cardizem SR as the most popular diltiazem hydrochloride product in the U.S.

56.     Dow and Carderm were the licensees of Elan's United States patents, United States Patents No. 4,894,240 (the "'240 Patent") and No. 5,002,776 (the "'776 Patent"), for sustained release delivery and absorption of Cardizem CD.

57.     Cardizem CD works by "blocking" the movement of calcium particles into the cells of the heart tissue and surrounding blood vessels. The Hoechst Defendants successfully developed a $700-million-plus annual U.S. market for Cardizem CD by persuading end payers and prescribing doctors that its unique chemical formulation increases cardiac blood flow, eases the workload on the heart (and thus lowers blood pressure), has relatively mild side effects, improves exercise tolerance in patients with angina, does not increase heart rate, and is safer and more effective than other CCBs for patients with ulcers and for active and hyperactive (stress) patients. Cardizem CD is also marketed on the basis that its unique chemical composition also has a higher angina therapeutic component than different CCBs.

58.     The United States patent on the compound diltiazem hydrochloride, the active ingredient in Cardizem CD, originally expired in February of 1988, but was extended by

legislation until November 1992. Thus, for the first time, after November of 1992, Dow began to face the threat of competition from generic pharmaceutical manufacturers.

IX.   **ALLEGATIONS COMMON TO ALL COMPLAINTS --
THE HOECHST DEFENDANTS ENGAGE IN UNFAIR TRADE
PRACTICES AND CONSPIRE WITH DOW, AND LATER ANDRX,
TO PREVENT COMPETITION IN THE CARDIZEM CD MARKET**

59.     Dow was the only manufacturer to produce and market diltiazem hydrochloride in prescription drug form in the U.S. until its patent expired in 1992.

60.     In 1993, Biovail, a Canadian corporation, was in the process of developing a bioequivalent formulation of once-daily diltiazem hydrochloride ("QD Diltiazem") to compete with Cardizem CD.

61.     In June 1993, before the Dow merger, Hoechst, through its subsidiary Hoechst-Roussel Pharmaceuticals, Inc. ("HRP"), entered into an Agreement with Biovail for the joint development and exploitation of QD Diltiazem drugs to compete in the U.S. with Cardizem CD. The first such Biovail product was a form of QD Diltiazem which Hoechst and Biovail intended to sell under the trademark "Tiazac."

62.     Like Cardizem CD, Tiazac is administered only once daily and provided the patient with diltiazem hydrochloride in the bloodstream throughout the day.

63.     On or about September 30, 1993, pursuant to Section 505(b) of the FD&C Act, Title 21, United States Code, Section 355(b) ("21 U.S.C. § 355(b)"), HRP gave notice to Dow and Carderm of HRP's NDA and certified that HRP's submission of its NDA to the FDA did not constitute an act of infringement of the Elan-licensed '240 Patent and '776 Patent pursuant to 35 U.S.C. § 271(e). The purpose of this NDA was to obtain approval for HRP and Biovail to manufacture and sell Tiazac in the U.S.

64.     In response to HRP's notice, on or about November 11, 1993, Dow and Carderm commenced a patent infringement lawsuit in the District of New Jersey styled <u>Marion Merrell Dow Inc. and Carderm Capital L.P. v. Hoechst-Roussel Pharmaceuticals Inc.</u>, Civil Action No. 93-5074 (AET).

65.     Dow and Carderm pursued that patent infringement litigation despite the absence of any reasonable belief that their claim might fairly be held to be valid upon adjudication.  In fact, no reasonable litigant could realistically have expected success on the merits.  Indeed, the adjudication of that action was not what Dow and Carderm were seeking.

66.     Dow's and Carderm's sole goal and intention in commencing the action against HRP was to indefinitely delay and prevent the entry of Tiazac into the marketplace.

67.     Because of the filing of the infringement action against HRP, HRP's NDA could not have been approved by the FDA until thirty months after Dow's and Carderm's receipt of the § 505(b) notice or such shorter or longer period as the New Jersey District Court might have ordered.

68.     HRP, individually and on behalf of Biovail, characterized Dow's patent infringement suit publicly and in papers filed with the court as frivolous and meritless.

69.     However, in late 1994, Hoechst agreed to acquire Dow, whereupon, in an about-face, HRP terminated its joint venture with Biovail.

70.     In April 1995, Biovail sued Hoechst and others (the "Hoechst Group") for breach of contract and antitrust violations.

71.     Hoechst, HMR's predecessor (Dow), and Biovail entered into a Settlement Agreement and Release on April 28, 1995 (the "Settlement Agreement"), resolving the pending

patent infringement suit by Dow against HRP and the litigation by Biovail against members of

the Hoechst Group.

72.     As part of the Settlement Agreement, a "General Release and Covenant Not to

Sue" was duly executed by Dow, the predecessor of defendant HMR, on its own behalf and for

its successors, assigns and their respective subsidiaries, affiliates and associated companies in

favor of Biovail, in which they explicitly covenanted not to "initiate any regulatory proceedings

or legal actions challenging or contesting in any manner whatsoever the Product, infringement

relating to the Product or regulatory approvals of the Product now or in the future."  "Product"

was defined in the Settlement Agreement to include Tiazac and "any improvements thereto or

any formulation thereof alone or in combination with at least one other active ingredient."

73.     Biovail also was assigned the rights to the NDA for Tiazac that had previously

been filed by HRP with the FDA.

74.     Thereafter, the FTC initiated an investigation of the proposed acquisition of Dow

by Hoechst pursuant to its authority under the Federal Trade Commission Act ("FTC Act"), 15

U.S.C. § 41 *et seq.*, and § 7 of the Clayton Act, 15 U.S.C. § 18.

75.     The Hoechst Defendants settled the FTC investigation by agreeing to the entry of

a consent order that was proposed on September 26, 1995 and became final on April 17, 1996

("FTC Order").

76.     The FTC Order contains an express provision requiring the Hoechst Defendants to

give Biovail a letter of reference to the toxicology data filed with FDA in support of Dow's NDA

covering Cardizem CD.

77.     Toxicology data demonstrating a product's safety and efficacy is required by FDA

regulations at the time an NDA is submitted to FDA for filing.  If such data is not filed, the filer

must submit a letter of reference that allows the filer to refer to and adopt the toxicology data already filed with the FDA by a previous filer.

78.     Specifically, the FTC Order compelled the Hoechst Defendants to "make the necessary filings with the FDA authorizing the FDA to refer to the appropriate section(s) of Dow's [now HMR's] NDA No. 18-602 for such data (including, but not limited to, pharmacology and toxicology data) in support of Biovail NDA No. 20-401 for Biovail Diltiazem Products, *including any supplemental NDAs or related NDAs."* (emphasis added)

79.     "Biovail Diltiazem Products" were defined in the FTC Order as "the sustained release and/or extended release diltiazem products that Hoechst was developing with Biovail pursuant to the Rights Agreement that Hoechst and Biovail entered into on June 30, 1993."

80.     In accordance with the FTC Order, on or about December 18, 1995, HMR wrote to FDA as follows:

> Hoechst Marion Roussel, Inc. (formerly Marion Merrell Dow Inc.) ("HMR") hereby authorizes Biovail Corporation International ("Biovail") to reference the pharmaceutical toxicology and animal reproductive toxicology data contained in HMR's NDA 18602 for diltiazem hydrochloride in support of Biovail's NDA No. 20401 for once-a-day dosage form of diltiazem hydrochloride, ***including any supplemental NDAs or NDAs related to that product***. (emphasis added)

81.     On February 5, 1996, Biovail sought the FDA's written confirmation that the scope of the right of reference set out in HMR's December 18, 1995 letter was broad enough to encompass future NDA submissions involving diltiazem-based drug products that Biovail might file.

82.     By letter dated April 8, 1996, the FDA confirmed that the "right of reference" to the non-clinical data in HMR's NDA No. 18-602 was broad enough to cover "any diltiazem hydrochloride new drug application or supplement that Biovail submits."

83.     In a press release issued at the time of the announcement of the settlement with Hoechst that led to the entry of the FTC Order, William J. Baer, then FTC Bureau of Competition Director, stated that *"often one of the barriers to entry for new drugs may be strategic conduct -- efforts to delay entry through litigation or interference in the regulatory process."* (emphasis added)

84.     The purposes and intended effects of the Settlement Agreement, the FTC Order and the Letter of Reference were to ensure that the Hoechst Defendants would not attempt to employ such tactics to prevent Biovail from obtaining FDA approvals for Biovail Diltiazem Products, including any supplemental or related NDAs.

85.     After the Hoechst-Dow merger, Hoechst, HMR and Carderm (collectively the "Hoechst Companies") continued to engage in illegal and unfair trade practices in furtherance of their scheme to prevent competition in the Cardizem CD market in the United States.

86.     In the summer of 1996, the Hoechst Companies learned that:  (a) Biovail was resolving its patent dispute with Elan, which in light of the December 18, 1995 letter of reference, would have been the only remaining impediment to the FDA's approval of Biovail's generic version of Cardizem CD; (b) Biovail was preparing to file an ANDA with the FDA seeking approval of an AB-rated generic version of Cardizem CD; and (c) Biovail was also preparing to submit *an NDA* to the FDA for an AB-rated generic version of Cardizem CD which required, as a precondition to filing, the letter of reference.

87.     The Hoechst Defendants knew from the FDA's past practice that with the December 18, 1995 letter of reference, Biovail's *NDA* for a generic of Cardizem CD would likely be approved by the FDA within approximately 9-24 months of the date of Biovail's NDA filing.

88.     Since ***drugs covered by NDA's are not subject to the Paragraph IV Certification or the 180-day exclusivity period imposed on all ANDA filers except the first ANDA filer***, Biovail's **NDA** filing for FDA approval of its generic of Cardizem CD would have been unaffected by Andrx's 1995 first-filed ***ANDA*** for generic Cardizem CD (Cartia XT) (*see* Section X *infra*).  Accordingly, Biovail's generic version of Cardizem CD would have been promptly approved for marketing under ***the NDA route***, and would have been available in the United States by no later than April 1998, <u>before</u> Andrx's ANDA was approved, and unaffected by Andrx's 180-day marketing exclusivity over other generic Cardizem CD **ANDA** applicants.

89.     Faced with the imminent loss of their Cardizem CD monopoly, the Hoechst Defendants: (a) first wrote to the FDA on July 11, 1996 to attempt to limit the scope of the right of reference to Tiazac only; and (b) dispatched a Hoechst-HMR representative (Edward Stratemeier, HMR's Vice President and General Counsel) to meet with Biovail's executives at Biovail's headquarters in Canada on a Sunday in August 1997, at which time he offered Biovail a bribe of at least $20 million cash from Hoechst not to market a generic version of Cardizem CD before January 2000.  The Hoechst-HMR representative explained that Hoechst, the public company, had represented to shareholders that it believed it would not encounter generic competition before 2000, by which time HMR would have a new blockbuster drug to market which could replace the inevitable loss of revenues which would accompany the shift in the market from Cardizem CD to its generic bioequivalents.  The Hoechst-HMR representative also threatened Biovail that HMR would sue Biovail for patent infringement, notwithstanding its covenant not to sue, if Biovail filed an NDA for generic Cardizem CD.

90.     Biovail refused the Hoechst-HMR bribe and informed their representative that Biovail intended to file an NDA for generic Cardizem CD, using the right of reference to expedite FDA approval.

91.     In a desperate and bad-faith response, on or about October 28, 1996, the Hoechst Defendants delivered a second letter to the FDA renouncing the wording of their December 18, 1995 "right of reference" letter, telling the FDA that the right of reference did *not* apply to any QD Diltiazem formulation other than the one originally submitted for Tiazac, and that the right of reference could not be used for any new NDA's submitted by Biovail for diltiazem-based drug products.

92.     The Hoechst Defendants' renunciation tied the FDA's hands, which had no authority to compel the Hoechst Group to honor its obligations under the FTC Order.  By letter dated November 8, 1996, the FDA advised Biovail that defendant HMR had renounced its earlier position and that, accordingly, "[i]n light of [HMR's] express limitation of the right of reference, the broader interpretation by the agency of the possible scope of the right of reference, which was conveyed to you by letter of April 8, 1996, is not applicable."

93.     The Hoechst Defendants' purported limitation of the right of reference plainly contradicted the clear wording of the December 18, 1995 letter of reference itself, and breached the Settlement Agreement and the FTC Order.

94.     The Hoechst Defendants' renunciation of the right of reference compelled the FDA to reject Biovail's NDA filing and precluded Biovail from filing an expedited NDA for generic Cardizem CD without first producing redundant independent toxicology data that would require many months and millions of dollars to obtain and submit and many months or years for the FDA to approve.  By this blatantly unfair, unreasonable, dishonest and predatory conduct, the

Hoechst Defendants prolonged their monopoly over the Cardizem CD market for the time being and prevented purchasers from obtaining access to a lower-priced generic version of Cardizem CD.

95.     The Hoechst Defendants renounced their right of reference despite the absence of any reasonable belief in the merits of the assertions in such renunciation. The Hoechst Defendants' sole purpose and intent behind their renunciation of the FTC-mandated right of reference was to prolong their Cardizem CD monopoly by the restrictive and exclusionary act of preventing the introduction on the Cardizem CD market of Biovail's generic version of Cardizem CD, which would have reduced the Hoechst Defendants' share of the market for Cardizem CD and its generic bioequivalents and the supra-competitive prices paid by purchasers.

96.     Biovail sued Hoechst, HMR and Carderm in the United States District Court for the District of New Jersey for, *inter alia*, violations of antitrust laws in connection with this frivolous and predatory act of renunciation of the right of reference. On June 1, 1999, that court denied each of defendants' motions to dismiss Biovail's Complaint. 39 F. Supp.2d 750 (D.N.J. 1999). Biovail and Hoechst settled that lawsuit in January 2001.

## X.     ALLEGATIONS COMMON TO ALL COMPLAINTS -- THE HOECHST COMPANIES' EFFORTS TO PREVENT ANDRX FROM COMPETING WITH CARDIZEM CD

97.     Prior to August 1995, Defendant Andrx had been developing its own generic version of Cardizem CD.

98.     In or about August of 1995, Andrx provided samples of its proposed Cartia XT generic substitute for Cardizem CD to the Hoechst Defendants so that they could perform their own tests to see that there was no infringement of the patents claiming Cardizem CD and to avoid the need to have any litigation over the matter.

99.     On September 22, 1995, defendant Andrx filed an ANDA for a generic version of Cardizem CD and duly made a Paragraph IV Certification with respect to all unexpired patents listed in the Orange Book allegedly claiming Cardizem CD.

100.    On November 28, 1995, more than two months after Andrx filed its ANDA, the U.S. Patent and Trademark Office issued United States Patent No. 5,470,584 (the "'584 Patent") to Carderm, which licensed it to HMR.

101.    The '584 Patent claims a "dissolution profile," which is the amount of diltiazem released over specified periods of time.  The '584 Patent was listed by the Hoechst Companies with the FDA in the FDA "Orange Book" as covering Cardizem CD.  The '584 Patent represented no substantive change or improvement to Cardizem CD, but rather, was prosecuted and listed solely to give HMR a basis for initiating sham patent litigation to delay and exclude Andrx's generic Cardizem CD from the Cardizem CD market for at least 30 months (under Hatch-Waxman).

102.    In January 1996, HMR and Carderm filed a patent infringement suit against Andrx in the United States District Court for the Southern District of Florida (the "Hoechst-Andrx Patent Case"), alleging that Andrx's filing of its ANDA for generic Cardizem CD infringed the '584 Patent.  The filing of the lawsuit triggered the 30-month Hatch-Waxman Act waiting period, which expired on July 3, 1998.

103.    Notwithstanding that its ANDA did not infringe the '584 Patent, Andrx took the extra prophylactic step of amending its ANDA on April 4, 1996 to specify a dissolution profile that was even more clearly distinct from that claimed by the '584 Patent.  Indeed, Andrx claimed only a dissolution profile (not less than 55% of total diltiazem released after 18 hours) which was within the dissolution range that Carderm had specifically canceled from its application for the

'584 Patent.  The dissolution profile claimed in the '584 Patent (0-45% of total diltiazem released

after 18 hours) plainly excluded that disclosed in Andrx's Amended ANDA.

104.    HMR, Carderm and Hoechst pursued the Hoechst-Andrx Patent Case after

receiving notice of Andrx's April 4, 1996 Amended ANDA, despite the absence of any

reasonable belief that their claim would be held to be valid upon adjudication.  In fact, no

reasonable litigant could realistically expect success on the merits.  Indeed, the adjudication of

that action is not what HMR, Carderm and Hoechst were actually seeking.  HMR's, Carderm's

and Hoechst's goal and intention in pursuing the Hoechst-Andrx Patent Case was solely to

indefinitely delay and prevent the entry of Andrx's product into the marketplace and invoke the

automatic 30-month administrative delay in the FDA approval process.

105.    Andrx filed counterclaims, accusing HMR and Hoechst of violating United States

and Florida antitrust laws by virtue of their course of conduct, conspiracies and other unfair and

illegal tactics employed to protect HMR's Cardizem CD monopoly.

106.    On September 15, 1997, while, consistent with the Hoechst Defendants' goals, the

patent and antitrust suit dragged on, the FDA gave preliminary approval to Andrx' amended

ANDA for generic Cardizem CD.  Thus, under FDA regulations, Andrx would have been entitled

to introduce its generic version of Cardizem CD on or about September 15, 1997, but for the

Hoechst Defendants' continued "prosecution" of the baseless Hoechst-Andrx Patent Case.

107.    Meanwhile, Biovail and another drug company, Faulding Inc. ("Faulding"), had

also submitted ANDAs to the FDA with Paragraph IV Certifications (and in Biovail's case, an

ANDA *and* an NDA) for generic versions of Cardizem CD.  The Hoechst Defendants did *not* sue

Biovail for patent infringement within the 45-day prescribed period, thereby allowing the FDA to

proceed with approval of Biovail's generic Cardizem CD applications.

108.    Unless the Hoechst Defendants could come up with a way to keep their competitors' generic Cardizem CD off the market, they could lose their monopoly over the market for Cardizem CD and its generic bioequivalents by no later than July 1998, when the 30-month Hatch-Waxman period would expire and the FDA would allow Andrx to begin marketing its generic Cardizem CD, notwithstanding the continued pendency of the Hoechst-Andrx Patent Case.

109.    The earlier of the date on which Andrx begins marketing its generic version of Cardizem CD or the date on which it successfully concludes its patent suit with HMR has crucial importance to all potential competitors for the market for generic Cardizem CD.  As the first ANDA filer for generic Cardizem CD, Andrx gets the benefit of the Hatch-Waxman Act's 180-day marketing exclusivity period over all subsequent ANDA filers (but not NDA filers), even though the FDA may otherwise be prepared to approve a later applicant's ANDA submission (such as Biovail's or Faulding's).

110.    Accordingly, if the owner of the listed, brand-name drug (here, HMR) conspires with the first ANDA filer (here, Andrx) to preclude or delay the commencement of marketing of the ANDA filer's generic, the sale of *any* generic Cardizem CD could be prevented until expiration of all of the patents claiming Cardizem CD listed in the Orange Book.  Indeed, the FDA has expressed great concern that generic competition could be delayed indefinitely if financial incentives were illicitly provided by the owner of the brand name drug to the ANDA holder to delay marketing of its generic.  This is exactly what has happened in this case.

## XII.    ALLEGATIONS COMMON TO ALL COMPLAINTS -- THE MARKET ALLOCATION AGREEMENT BETWEEN HMR AND ANDRX

111.    On or about September 26, 1997, defendants HMR and Andrx entered into a conspiratorial market allocation agreement which was intended to prevent *any* generic

competition for Cardizem CD in the U.S. marketplace, in exchange for the Hoechst Defendants'
nonrefundable payments to Andrx of at least $40 million ($40,000,000) per year.  The agreement
further provided that, if and when Andrx eventually (and inevitably) obtained a judgment that it
had not infringed the '584 Patent, the payments would increase, retroactively, to *$100 million* per
year.  This collusive and anti-competitive agreement had the effect and purpose of allowing the
Hoechst Defendants to continue to maintain their monopoly market share while continuing to set
artificially high prices for Cardizem CD in the Indirect Purchaser States and throughout the
United States, unaffected by generic competition.

112.    Under the Hoechst-Andrx Agreement, HMR was obliged, beginning July 9, 1998
(the date the 30-month patent litigation freeze on FDA approval of Andrx's ANDA expired), to
make quarterly non-refundable payments to Andrx of ten million dollars ($10,000,000) until the
Hoechst-Andrx Patent Case, including all appeals, was over, in exchange for (a) Andrx'
agreement not to market any generic Cardizem CD product in the United States or assign its
rights to market any such product, (b) Andrx' withdrawal of its antitrust counterclaims in the
Hoechst-Andrx Patent Case, and (c) incredibly, <u>Andrx's commitment to continue to prosecute
and not waive any rights under its ANDA</u> (which thereby precluded Biovail, Faulding and all
other generic manufacturers from obtaining FDA approval for generic Cardizem CD).  Andrx's
ANDA filing was the sole act of patent infringement asserted by HMR in the Hoechst-Andrx
Patent Litigation.

113.    Indeed, the Hoechst Defendants' sham patent infringement claim against Andrx
was based upon Andrx's prosecution of its ANDA!  Thus, the Hoechst Defendants agreed to pay
Andrx at least $40 million per year, but only on the condition that Andrx continue to engage in

the same activity (prosecution of its ANDA) for which HMR was suing Andrx in the Hoechst-Andrx Patent Litigation.

114.    At the time of the first payment, the anti-competitive payments from the Hoechst Defendants constituted all of Andrx' profits.

115.    Similarly, in the Hoechst-Andrx Agreement, HMR offered to grant Andrx a license to market Cardizem CD, provided that Andrx not withdraw its allegedly patent-infringing ANDA, and not waive or assign its 180-day exclusivity rights against subsequent ANDA filers for generic Cardizem CD.  Thus, the terms of the license enabled the Hoechst Defendants and Andrx to continue to block any generic competition for Cardizem CD, even after Andrx entered the Cardizem CD market through the license from HMR.

116.    But for the Hoechst-Andrx Agreement, Andrx would have begun marketing (or licensing) its generic version of Cardizem CD (Cartia XT) on or shortly after July 9, 1998, and the FDA could have approved other generic Cardizem CD ANDAs 180 days later.  Indeed, the FDA tentatively approved Faulding's ANDA for a generic bioequivalent for Cardizem CD on October 26, 1998.  The only thing preventing Andrx from marketing or licensing Cartia XT after July 9, 1998 was its agreement with HMR and the tens of millions of dollars it received under the agreement.

117.    Indeed, in the Hoechst-Andrx Patent Case, Andrx represented to the United States District Court for the Southern District of Florida that it "intends to manufacture and sell its once-a-day diltiazem composition as soon as it receives FDA approval."

118.    While HMR and Andrx call the Hoechst-Andrx Agreement a "stipulation," they never filed the agreement with the court presiding over the Hoechst-Andrx Patent Case nor even informed that court of the existence of the Hoechst-Andrx Agreement.  Moreover, neither

Hoechst nor Andrx, publicly traded companies, *has ever filed* the Hoechst-Andrx Agreement as an exhibit to any of their respective public filings under the Securities Exchange Act of 1934.

119.    The Hatch-Waxman Act requires parties to a Paragraph IV patent infringement action to cooperate to expedite the action.  However, not surprisingly, the Hoechst-Andrx Patent Case was not actively prosecuted after the Hoechst-Andrx Agreement was executed until after the filing of the lawsuits which are the subject of these complaints, as both parties were satisfied with the arrangement whereby they carved up the profits from their horizontal restraint of trade, permitting Hoechst's continued monopoly over Cardizem CD.  Indeed, Andrx was in no hurry to win, as it stood to receive $100 million per year in pure profit without any accompanying manufacturing, marketing, or overhead costs.  That sum represented a modest price for HMR to perpetuate its $700-million-per-year monopoly.  Accordingly, neither party to the Hoechst-Andrx Patent Case had any incentive to move the three-year-old patent infringement case to a conclusion.

120.    The Hoechst Defendants entered the Hoechst-Andrx Agreement not only with the aim of buying protection from Andrx' generic version of Cardizem CD, but, equally importantly, to secure protection from Biovail's, Faulding's, and other potential generic competitors' ANDAs for generic versions of Cardizem CD, because Biovail, Faulding and others could not begin to market such generic bioequivalent Cardizem CD until Andrx's 180-day exclusivity period ended.

121.    Defendants' ulterior motives are blatantly illustrated by the provisions of the Hoechst-Andrx Agreement wherein Andrx is ***obligated***, as a condition to the Hoechst Defendants' obligations, to (a) continue to "diligently prosecute" its ANDA for generic Cardizem CD, and (b) "not relinquish or compromise any right accruing thereunder or pertaining thereto."

Surely a bona fide litigant would have no legitimate interest in requiring an alleged infringer to continue the infringing activity while litigation proceeded.

122.   Andrx, for its part in this illicit bargain, was paid handsomely for simply doing nothing and delaying the introduction of its generic version of Cardizem CD into the U.S. marketplace.

123.   Notwithstanding these blatantly anti-competitive motives and effects, the Hoechst Defendants and Andrx have had the gall to portray the agreement publicly as "pro-competitive."

124.   This horizontal Hoechst-Andrx Agreement is a private agreement between private parties, and the anticompetitive effects that flow from it are the result of purely private action. No agency or official of any government, whether federal, state or local, has sanctioned or created this arrangement.  No governmental agency or official has chosen to prevent Andrx's entry into the market until the conclusion of the patent infringement action.  On the contrary, the only government agency to have taken a position on the matter (the FDA) affirmatively authorized Andrx to market its generic Cardizem CD product as early as September 15, 1997 (subject to the outcome of the sham litigation), and by no later than July 9, 1998.  The absence of generic competition in the Cardizem CD and its generic bioequivalents markets since September 1997, or at the latest, July 9, 1998, and going forward is the result of a private agreement between competitors and is not the result of any government action whatsoever.

125.   All class members are the intended, foreseeable, and direct victims of this collusive and unlawful conduct by the Hoechst Defendants and Andrx, and as a result, are sustaining and will continue to sustain direct and indirect economic damages attributable to this illegal conspiracy in restraint of trade.

126.    The aforesaid conduct of the Hoechst Defendants and Andrx has resulted in class members' massive overpayments for Cardizem CD and its generic bioequivalents.

## XIII.    ALLEGATIONS COMMON TO ALL COMPLAINTS --
   SETTLEMENT OF THE HOECHST-ANDRX PATENT CASE
   AND MARKETING OF CARTIA XT BY ANDRX IN RESPONSE
   TO THE CLASS ACTIONS AND REGULATORY INVESTIGATION

127.    The first class action lawsuit challenging the actions detailed herein was filed on behalf of California purchasers by the Co-Lead Plaintiffs' Counsel for State Law Cases in California state court on August 20, 1998.  Betnor, Inc. d/b/a Reliable Drug Center, et al., v. Hoechst Aktiengesellschaft, et al., 99-CV-124 (MHP).  Such law firms filed additional similar class actions on behalf of plaintiffs in other states in August through November 1998. Thereafter, on or about December 2, 1998, Hoechst and Rhone Poulenc Rorer announced their agreement to merge and form the world's second largest drug company.  The merger required regulatory approval, including approval by the FTC.

128.    The FTC obtained such class action complaints for purposes of investigating whether the actions alleged violated the FTC Act and, in March 2000, initiated an administrative action against HMRI and Andrx under Docket No. 9293.

129.    In the December 10, 1998 edition of *The Wall Street Journal*, it was reported that the FTC was investigating whether the Hoechst Defendants engaged in illegal anticompetitive behavior with respect to its Cardizem CD product, including its entry into the Hoechst-Andrx Agreement.  Andrx confirmed this report in its August 1999 SEC Form 10-Q, where it disclosed that it was notified by the FTC in October 1998 (two months after plaintiffs commenced the first of these actions) that the agency was investigating "whether Andrx, HMR or any other person had engaged in unfair methods of competition . . . which [Andrx] believes is related to [the Hoechst-Andrx Agreement]." *The Wall Street Journal* reported in its October 1, 1999 edition

that the FTC Bureau of Competition has recommended to the Commissioners that the FTC sue

the Hoechst Defendants and Andrx under the FTC Act for the conduct alleged herein.

130.    As a result of the increasing pressure brought to bear on the Hoechst Defendants

and Andrx by the filing of the related actions that are coordinated in this Court, and the FTC's

consequent investigation of the anticompetitive effects of the Hoechst-Rhone Poulenc Rorer

merger, the Hoechst Defendants decided to discontinue their sham patent litigation against

Andrx.  In a carefully orchestrated and utterly disingenuous public relations move, designed to

enhance their class action litigation and FTC postures, Hoechst and Andrx announced on June 9,

1999, that they had agreed to settle the Hoechst-Andrx Patent Case as a result of an amendment

to Andrx's ANDA which reformulated its generic Cardizem CD.  None of the changes specified

in Andrx's ANDA amendment, which Andrx had filed with the FDA in September 1998, affected

the merits of the Hoechst-Andrx Patent Case; they were merely referenced as a facile way of

portraying the Hoechst Defendants' surrender as a settlement.

131.    At the time of the settlement, Hoechst paid Andrx a final sum of $50,732,578.70,

bringing its total payments under the Hoechst-Andrx Agreement to $89,863,013.70.

132.    Andrx's generic product, marketed under the name Cartia XT, has been sold at a

substantial discount to the price of Cardizem CD since June 1999.  Other generics entered the

market beginning in December 1999, after Andrx's 180-day exclusivity expired.  By September

25, 1999, 10 weeks after entering the market, Cartia XT accounted for approximately half of new

prescriptions for Cardizem CD and its generic bioequivalents.  By September 2000, generic

bioequivalent versions of Cardizem CD had captured over 70% of the U.S. market for Cardizem

CD and its generic bioequivalents.  By December 2000, with generic bioequivalents settling at

half the price of Cardizem CD, the Hoechst Defendants sold the rights to the entire Cardizem



product line to Biovail for approximately $409.5 million, (approximately 7 months of Cardizem

CD sales prior to generic entry) to settle Biovail's litigation against the Hoechst Defendants.

## XIV.   ALLEGATIONS COMMON TO ALL COMPLAINTS --
##        RELEVANT MARKETS

133.   Sales of Cardizem CD and its FDA-approved AB-rated generic bioequivalents

constitute a relevant product market for antitrust purposes.

134.   Due to FDA regulations, once a physician prescribes Cardizem CD, a consumer

patient may only purchase Cardizem CD or its FDA-approved AB-rated bioequivalent.  Hence,

physicians' prescribing practices and FDA approval barriers define the relevant market, as judged

from the perspective of class members.  Until Andrx began shipping Cartia XT on June 23, 1999,

and other generic manufacturers began shipping generic Cardizem CD in December 1999,

Cardizem CD comprised the entire United States market for Cardizem CD and its generic

bioequivalents, with a 100% share.

## XV.    ALLEGATIONS COMMON TO ALL COMPLAINTS --
##        ANTICOMPETITIVE AND INEQUITABLE EFFECTS

135.   As a result of defendants' methods, acts, combinations, conspiracies, and their

resulting exclusionary, monopolistic and unlawful trade restraints described above, the prices for

Cardizem CD and its generic bioequivalents have been fixed, raised, maintained and stabilized at

artificially high and noncompetitive levels by defendants, while a 100% market share was

maintained between them until December 1999, free from natural competition, thus causing

those who paid for Cardizem CD and Cartia XT sold in the Indirect Purchaser States and

throughout the United States to have paid many millions of dollars more for Cardizem CD and

Cartia XT than they would have had to pay under natural conditions of competition in the

absence of such illegal restraints of trade.   Subsequent to December 1999, the prices paid by end

payers for all generic bioequivalent versions of Cardizem CD have been higher than they would have been due to defendants' illegal actions described above which delayed generic competition.

136.     The Hoechst Defendants' actions as alleged above were willful, and served to unlawfully extend the Hoechst Defendants' monopoly and the Hoechst-Andrx duopoly over the market for Cardizem CD and its generic bioequivalents in the Indirect Purchaser States and the United States.

137.     Plaintiffs and the class members are the sole victims and targets of defendants' conduct.

### *PRAYERS FOR RELIEF SPECIFIC TO EACH ACTION*

A.     **Lightner, *et al.* v. Hoechst Aktiengesellschaft, *et al.* (M.D. Ala. Case No. CV-99-T-784 (MHT)) (Michigan Case No. 99-CV-75070)**

### FIRST CLAIM FOR RELIEF

### (Restitution/Disgorgement for Unjust Enrichment/Assumpsit/Money Had and Received)

### (Against All Defendants)

(i)     Alabama plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)     The Hoechst Defendants have benefited from the overcharges they have been able to levy for Cardizem CD, resulting from acts alleged in this Complaint, and resulting in overpayments by plaintiffs and the class for Cardizem CD.

(iii)     Defendant Andrx has benefited from the acts alleged in this Complaint to the extent of the payments ($89,860,000) it has received under the Hoechst-Andrx Agreement.  The funds for such payments by the Hoechst Defendants derived from plaintiffs' and the class' overpayments for Cardizem CD.

(iv)    Plaintiffs and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiffs' and the class' economic detriment.

(v)    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(vi)    The benefit held by the Hoechst Defendants and Andrx rightfully belongs to plaintiffs and the class, as plaintiffs and the class paid these anticompetitive sums to defendants during the Class Periods, when the Hoechst Defendants, and later Andrx, used anticompetitive measures to block generic entry into the market.

(vii)    It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(viii)    It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiffs' and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement and the acts alleged herein, designed to prevent introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs and the class pray for a judgment against all defendants, jointly and severally, as follows:

a.    granting plaintiffs and the class relief in the nature of restitution or disgorgement of defendants' unjust enrichment;

b.      granting plaintiffs and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

c.      granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the class demand trial by jury on all claims for which there is a right to a jury trial.

**B.      Aetna U.S. Healthcare, Inc., _et al._ v. Hoechst Aktiengesellschaft, _et al._ (N.D. Cal. Case No. C-98-124 (MHP)) (Michigan No. 99-CV-73412)**

**Betnor, Inc., d/b/a Reliable Drug Center, _et al._ v. Hoechst Aktiengesellschaft, _et al._ (N.D. Cal. Case No. C-98-4729 (MHP)) (Michigan No. 99-CV-73422)**

**Galloway, Inc., _et al._ v. Hoechst Aktiengesellschaft, _et al._ (S.D. Cal. Case No. 99-CV-0645 TW (JAH)) (Michigan No. 99-CV-73871)**

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Hoechst-Andrx Agreement Amounts To A _Per Se_ Violation Under Section 16720 of California's Business and Professions Code (California's Cartwright Act)

### (Against All Defendants)

(i)      California plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)      California's Cartwright Act, § 16720, provides:

Trust Defined

A trust is a combination of capital, skill, or acts by two or more persons for any of the following purposes:

(a) To create or carry out restrictions in trade or commerce.

(b) To limit or reduce the production, or increase the price of merchandise or of any commodity.



(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.

\* \* \*

(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any combination of the following:

\* \* \*

(4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

(iii)    Section 16722 of the Cartwright Act further provides:

Any contract or agreement in violation of this chapter is absolutely void and is not enforceable at law or in equity.

(iii)    Section 16726 of the Cartwright Act further provides:

Except as provided in this chapter, every trust is unlawful, against public policy and void.

(iv)    Section 16750(a) of the Cartwright Act also provides:

Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction . . . and to recover three times the damages sustained by him or her, interest on his or her actual damages pursuant to Section 16761, and preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by the courts generally under the laws of this state and the rules governing these proceedings, and shall be awarded a reasonable attorneys' fee together with the costs of the suit.

(v)    The Hoechst-Andrx Agreement constitutes a "trust" as an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade. Such an allocation is a classic example of a trust as defined as a "combination of capital, skills or acts by two or more persons for . . . [the purpose of] (a) . . . creat[ing] or carry[ing] out restrictions in trade or commerce; (b) . . . limit[ing] [and] reduc[ing]



the production . . . or increase the price of merchandise or of any commodity; (c) . . . prevent[ing] competition in manufacturing, making, . . . sale . . . of merchandise [and] any commodity" which is *per se* prohibited under The Cartwright Act §§ 16720(a), (b) & (c) as "unlawful, against public policy and void" pursuant to § 16726. The Hoechst-Andrx Agreement is also a "trust" as the Hoechst Defendants and Andrx "ma[de][,] enter[ed] into [and] execute[d] [and] carr[ied] out . . . [in] which [they] . . . (4) agree[d] to pool, combine[d] [and] directly [and] indirectly unite[d] any interests that they [had] connected with the sale . . . of any such article or commodity, that its price might in any manner be affected" in violation of The Cartwright Act § 16720 (e)(4).

(vi)     Plaintiffs and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement is a *per se* violation of The Cartwright Act §§ 16720(a), (b), (c) & (e)(4).

### SECOND CLAIM FOR RELIEF

### <u>(Action For Damages Under Section 16750(a) of The Cartwright Act)</u>

### <u>(Against All Defendants)</u>

(vii)    California plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(viii)   With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in California, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in California for Cardizem CD and its generic equivalents.

(ix)     The foregoing conduct violates The Cartwright Act § 16720.  Plaintiffs seek the maximum damages permitted by law for these flagrant violations.

(x)      Under the Cartwright Act § 16750(a), plaintiffs and the class are entitled to have the Hoechst-Andrx Agreement declared void and are also entitled to three times the damages sustained by them, interest thereon, and reasonable attorneys' fees and costs of the suit.

### THIRD CLAIM FOR RELIEF

### (Action For Damages Under Section 17200 of The Business and Professions Code)

### (Against HMR and Hoechst)

(xi)     California plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xii)    The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference was unfair, fraudulent, and unlawful, performed solely for the purpose of preventing the appearance of Biovail's generic version of Cardizem CD on the Cardizem CD and its generic bioequivalents market, which would reduce Cardizem CD's market share and prices paid by purchasers, including plaintiffs.

(xiii)   The initiation and continued prosecution of the baseless Hoechst-Andrx Patent Case in the United States District Court for the Southern District of Florida were engaged in solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD to the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by purchasers, including plaintiffs.

(xiv)    Under the Business and Professions Code § 17200 *et seq.*, defendants' conduct alleged herein is unfair, fraudulent, and would violate 15 U.S.C. § 2.  Plaintiffs and the class, therefore, seek an order of the Court requiring the Hoechst Defendants to disgorge their gains



therefrom and award plaintiffs and the class full restitution of all monies obtained as a result of

the effects of the renunciation of the right of reference and the prosecution and continuation of

their baseless litigation against Andrx.  Plaintiffs and the class also seek interest on these

disgorged and restituted funds, and attorneys' fees pursuant to, *inter alia*, § 1021.5 of the

California Code of Civil Procedure.

### FOURTH CLAIM FOR RELIEF

**(Action For Disgorgement to Class Members of All Monies Obtained**
**By Defendants As A Result of Defendants' Acts of Unfair Competition**
**Under B&P Code §§ 17203 and 17204 and the Hoechst Defendants'**
**Illegal and Inequitable Acts Designed to Prolong the Hoechst Defendants'**
**Monopoly Over Cardizem CD and its Generic Bioequivalents)**

**(Against Hoechst and HMR)**

(xv)    California plaintiffs repeat and reallege each and every prior allegation contained

in this Complaint, except the class action allegations, with the same force and effect as if fully set

forth herein.

(xvi)   The Hoechst Defendants' baseless renunciation of the FTC-mandated right of

reference was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the

purpose of preventing the entry of Biovail's generic version of Cardizem CD onto the market for

Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market

share and prices paid by purchasers, including plaintiffs.

(xvii)   The initiation and continued prosecution of the baseless Hoechst-Andrx Patent

Case in the United States District Court for the Southern District of Florida were engaged in

solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem

CD to the market for Cardizem CD and its generic bioequivalents, which would have reduced

Cardizem CD's market share and the prices paid by purchasers, including plaintiffs.

(xviii)  Plaintiffs and the citizens of California have been and will continue to be injured directly and purposely in their money and property by the Hoechst Defendants' illegally secured, and subsequently shared (with Andrx), monopoly over Cardizem CD and its generic bioequivalents by the absence of any competition in this market.

(xix)   Pursuant to B&P Code §§ 17203 and 17204, plaintiffs and the class seek an order of this Court requiring Defendants to disgorge all ill-gotten gains and awarding plaintiff and the class full restitution of all monies obtained as a result of the effects of the Hoechst Defendants' unfair and fraudulent renunciation of the right of reference and their prosecution and continuation of their baseless and ill-motivated litigation against Andrx, on grounds that such acts violate § 17200 of the B&P Code and California public policy against unfair competition, plus interest and attorneys' fees pursuant to, *inter alia*, Section 1021.5 of the California Code of Civil Procedure, so as to restore any and all monies to plaintiffs, the class, and the general public which were acquired and obtained by means of such conduct by defendants and which ill-gotten gains are still retained by defendants.

### FIFTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(xx)    California plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xxi)   The Hoechst Defendants have benefited from the overcharges they have been able to levy for Cardizem CD resulting from acts alleged in this Complaint and the overpayments by plaintiffs and the class for Cardizem CD.

(xxii)   Defendant Andrx has benefited from the acts alleged in this Complaint to the extent of the $89,860,000 it has received under the Hoechst-Andrx Agreement.  The funds for such payments by Hoechst were derived from plaintiffs' and the class' overpayment for Cardizem CD.

(xxiii)  Plaintiffs and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiffs' and the class' economic detriment.

(xxiv)  The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate result of defendants' anticompetitive behavior restricting competition as set forth above.

(xxv)   The benefit held by the Hoechst Defendants rightfully belongs to plaintiffs and the class, as plaintiffs and the class paid these anti-competitive sums to defendants during both the Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

(xxvi)     It would be inequitable for Andrx to be permitted to retain any of the $89,860,000 received under the Hoechst-Andrx Agreement.

(xxvii)  It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiffs and the class' overpayment for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.



## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the Class pray for judgment against all defendants, jointly and severally, as follows:

    a.     declaring that the Hoechst-Andrx Agreement is a *per se* violation of The Cartwright Act §§ 16720(a), (b), (c) & (e)(4);

    b.     granting plaintiffs and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

    c.     awarding plaintiffs and the class treble damages, jointly and severally, for defendants' violations of The Cartwright Act §§ 16720(a), (b), (c) & (e)(4), in an amount to be determined at trial;

    d.     requiring the defendants to disgorge all monies illegally and inequitably acquired, and awarding plaintiffs and the class full restitution of all monies wrongfully acquired by defendants pursuant to §§ 17200 *et seq.*;

    e.     requiring the defendants to disgorge to the plaintiffs and the class all monies illegally and inequitably acquired pursuant to §§ 17203 and 17204;

    f.     granting plaintiffs and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs, pursuant to, *inter alia*, § 1021.5 of the California Code of Civil Procedure; and

    g.     granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the class demand trial by jury on all claims for which there is a right to a jury trial.

C.      <u>Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft, *et al.*</u> (D.D.C. Case No.
        1:99-CV-193 (RCL)) (Michigan No. 99-CV-74262)

### FIRST CLAIM FOR RELIEF

#### (Declaratory Judgment That the Market Allocation Agreement Amounts To A *Per Se* Violation Under Section 28-4502 of The District of Columbia's Code)

#### (Against All Defendants)

(i)      District of Columbia plaintiff repeats and realleges each and every prior allegation

contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)     The District of Columbia Code, § 28-4502 provides:

         Every contract, combination in the form of a trust or otherwise, or
         conspiracy in restraint of trade or commerce all or any part of
         which is within the District of Columbia is declared to be illegal.

(iii)    The District of Columbia Code, § 28-4503 also provides:

         It shall be unlawful for any person to monopolize, attempt to
         monopolize, or combine or conspire to monopolize any part of
         trade or commerce, all or part of which is within the District of
         Columbia.

(iv)     The District of Columbia Code § 28-4508 further provides:

         (a) Any person who is injured in that person's business or property
         by reason of anything forbidden by this chapter may bring a civil
         action for damages . . . . In such an action, . . . the court shall
         award as monetary relief:  (1) threefold the total damage sustained
         by such person; and (2) as determined by the court, the costs of suit
         including reasonable attorney's fees.

                              *   *   *

         (c) In any class action brought under this section by purchasers or
         sellers, the fact of injury and the amount of damages sustained by
         the members of the class may be proven on a class-wide basis,
         without requiring proof of such matters by each individual member
         of the class.  The percentage of total damages attributable to a
         member of such class shall be the same as the ratio of such
         member's purchases or sales of the class as a whole.

 

(v)     The District of Columbia Code § 28-4509(a) further provides:

> (a) Any indirect purchaser in the chain of manufacture, production, or distribution of goods and services, upon proof of payment of all or any part of any overcharge for such goods and services, shall be deemed to be injured within the meaning of this chapter.

(vi)    The Hoechst-Andrx Agreement is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade. Such an allocation is a classic example of a "contract, combination in the form of a trust . . . [and] conspiracy in restraint of trade [and] commerce . . ." which is *per se* prohibited under The District of Columbia Code § 28-4502.

(vii)   Plaintiff and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement is a *per se* violation of The District of Columbia Code § 28-4502.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Section 28-4502 of The District of Columbia Code)

### (Against All Defendants)

(viii)  District of Columbia plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ix)    With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in the District of Columbia, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby

 

succeeded in restraining trade in the District of Columbia for Cardizem CD and its generic equivalents.

(x)     The foregoing conduct violates the District of Columbia Code §§ 28-4502 and 28-4503.

(xi)     Plaintiff and the class seek the maximum damages permitted by law for their injuries caused by these flagrant violations.

**THIRD CLAIM FOR RELIEF**

**<u>(Claim for Damages Under Section 28-4503 of The District of Columbia Code</u>)**

**<u>(Against Defendants HMR and Hoechst)</u>**

(xii)     District of Columbia plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xiii)     The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of preventing the appearance of Biovail's generic version of Cardizem CD on the Cardizem CD and its generic bioequivalents market, which would reduce Cardizem CD's market share and prices paid by end-payer purchasers, including plaintiff.

(xiv)     The initiation and continued prosecution of the baseless Hoechst-Andrx Patent Case in the United States District Court for the Southern District of Florida were engaged in solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD to the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by end payer purchasers, including plaintiff.

(xv)   Under the District of Columbia Code § 28-4508(a), plaintiff and the class are entitled to three times the damages sustained by them as a result of the Hoechst Defendants' acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(xvi)   District of Columbia plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xvii)   The Hoechst Defendants have benefited from the overcharges they have been able to levy for Cardizem CD, resulting from acts alleged in this Complaint and the overpayments by plaintiff and the class for Cardizem CD.

(xviii)   Defendant Andrx has benefited from the acts alleged in this Complaint to the extent of the payments it has received under the Hoechst-Andrx Agreement.  The funds for such payments by Hoechst are derived from plaintiff's and the class' overpayment for Cardizem CD.

(xix)   Plaintiff and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiff's and the class' economic detriment.

(xx)   The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xxi)   The benefit held by the Hoechst Defendants rightfully belongs to plaintiff and the class, as plaintiff and the class paid these anti-competitive sums to defendants during both the

Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

(xxii)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(xxiii)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiff's and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein designed to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the class pray for judgment against all defendants, jointly and severally, as follows:

    a.    declaring that the Hoechst-Andrx Agreement is a *per se* violation of the District of Columbia Code §§ 28-4502 & 28-4503;

    b.    granting plaintiff and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

    c.    awarding plaintiff and the class treble damages, jointly and severally, for defendants' violations of the District of Columbia Code §§ 28-4502 & 28-4503, in an amount to be determined at trial;

    d.    granting plaintiff and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

    e.    granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the class demand trial by jury on all claims for which there is a right to a jury trial.

D.   **Jan Gabriel v. Hoechst Aktiengesellschaft, _et al._** (N.D. Ill. Case No. 98-C-7147 (ACW)) (Michigan No. 99-CV-73667)

## FIRST CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

(i)    Illinois plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)    The Hoechst Defendants have benefited from the overcharges they have been able to levy for Cardizem CD resulting from acts alleged in this Complaint and the overpayments by plaintiff and the class for Cardizem CD.

(iii)    Defendant Andrx has benefited from the acts alleged in this Complaint to the extent of the payments ($89.86 million) it has received under the Hoechst-Andrx Agreement. The funds for such payments by the Hoechst Defendants derive from plaintiff's and the class' overpayment for Cardizem CD.

(iv)    Plaintiff and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiff's and the class' economic detriment.

(v)    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(vi)    The benefit held by the Hoechst Defendants and Andrx rightfully belongs to plaintiff and the class, as plaintiff and the class paid these anticompetitive sums to defendants during both the Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anticompetitive measures to block generic entry into the market.

(vii)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(viii)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiff's and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the acts alleged herein designed to prevent introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the class pray for a judgment against all defendants, jointly and severally, as follows:

a.   granting plaintiff and the class relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

b.   granting plaintiff and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees; and

c.   granting such further relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the class demand trial by jury on all claims for which there is a right to a jury trial.

E.    **Marshall Ross v. Hoechst Marion Roussel, Inc., *et al.* (D. Mass. Case No. 00-CV-12312) (Michigan No. 01-CV-70490)**

## FIRST CLAIM FOR RELIEF

### (Action For Damages Under Massachusetts General Law, Chapter 93A, Section 2)

### (Against All Defendants)

(i)     Massachusetts plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)     Massachusetts' Consumer Protection Act, Massachusetts General Law, Chapter 93A, Section 2, provides:

> Unfair Methods of Competition, etc., Declared Unlawful; Legislative Intent; Rules and Regulations.

> (a)     Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

> (b)     It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

> (c)     The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended.

(iii)     With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Massachusetts, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust

and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Massachusetts for Cardizem CD and its generic bioequivalents.

(iv)     The foregoing conduct violates Massachusetts General Law, Chapter 93A, Section 2, as the establishment, maintenance and conspiracy to monopolize is an "unfair method of competition" and an "unfair ... act [and] practice" under the statute.

(v)      Plaintiff and the class seek the maximum damages permitted by law for their injuries caused by these violations.

### THIRD CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(vi)     Massachusetts plaintiff repeats and realleges each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

(vii)    The Hoechst Defendants have knowingly accepted and benefitted from the overcharges they have been able to levy for Cardizem CD resulting from acts alleged herein and overpayments by plaintiff and the class for Cardizem CD.

(viii)   Defendant Andrx has benefitted from the acts alleged in this Complaint to the extent of the payments ($89.86 million) it has received under the Hoechst-Andrx Agreement. The funds for such payments by Hoechst are derived from plaintiff's and the class' overpayments for Cardizem CD.

(ix)     Plaintiff and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiff's and the class' economic detriment.

1369 / CMP / 00050022.WPD v1                          66



(x)     The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xi)    The benefit held by the Hoechst Defendants rightfully belongs to plaintiff and the class, as plaintiff and the class paid these anti-competitive sums to defendants during both the Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

(xii)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(xiii)  It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiff's and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the class pray for judgment against all defendants, jointly and severally, as follows:

   a.     granting plaintiff and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

   b.     awarding plaintiff and the class treble damages, jointly and severally, for defendants' violations of Massachusetts General Law, Chapter 93A, Section 2, in an amount to be determined at trial;

   d.     granting plaintiff and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

   e.     granting such other relief as this Court may deem just and proper under the circumstances.

 

F.    **Zuccarini, *et al.* v. Hoechst Aktiengesellschaft, *et al.*** **(E.D. Mich. Case No. 98-74043 (NGE))**

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment That The Hoechst-Andrx Agreement**
**Amounts To A *Per Se* Violation Under Section 445.772 of Michigan's**
**Antitrust Reform Act ("MARA"))**

**(Against All Defendants)**

(i)    Michigan plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)    MARA, MCL § 445.772, provides:

> Sec. 2. A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful.

(iii)    MARA, MCL § 445.778(2), also provides:

> Any other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring action for appropriate injunctive or other equitable relief against immediate irreparable harm, actual damages sustained by reason of a violation of the act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees. If the trier of fact finds that the violation is flagrant, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act.

(iv)    The Hoechst-Andrx Agreement described hereinabove is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade. Such an allocation is a classic example of a "contract . . . between 2 or more persons in restraint of . . . trade and commerce" which is *per se* prohibited under MARA, MCL § 445.772.

 

(v)     Plaintiffs and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement is a *per se* violation of MARA, MCL § 445.772.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Section 445.772 of MARA)

### (Against All Defendants)

(vi)     Michigan plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(vii)     With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Michigan, the Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Michigan for Cardizem CD and its generic equivalents.

(viii)     The foregoing conduct violates MARA, MCL §§ 445.772.

(ix)     Plaintiffs and the class seek the maximum damages permitted by law for these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action For Damages Under Section 445.773 of MARA)

### (Against HMR and Hoechst)

(x)     Michigan plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xi)     MARA, MCL § 445.773, provides:

Sec. 3.  The establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful.

(xii)    The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of preventing the appearance of Biovail's generic version of Cardizem CD on the Cardizem CD and its generic bioequivalents market, which would reduce Cardizem CD's market share and prices paid by third-party payers, pharmacies and consumers, including plaintiffs.

(xiii)   The initiation and continued prosecution of the baseless Hoechst-Andrx Patent Case in the United States District Court for the Southern District of Florida were engaged in solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD to the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by third-party payers, including plaintiffs.

(xiv)    Under MARA, MCL § 445.778(2), plaintiffs and the class are entitled to three times the damages sustained by them as a result of the Hoechst Defendants' flagrant acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Disgorgement and Restitution For All United States End Payers For Unjust Enrichment)

### (Against All Defendants)

(xv)     Michigan plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

 

(xvi)   The Hoechst Defendants have benefitted from overcharges they have been able to impose on end payers for Cardizem CD resulting from acts alleged in this Complaint which delayed generic competition for Cardizem CD, and resulting in overpayments by plaintiffs and the class for Cardizem CD.

(xvii)   The payments ($89,860,000) defendant Andrx received under the Hoechst-Andrx Agreement were an unjust benefit derived from plaintiffs' and the class' overpayments for Cardizem CD.

(xviii)   The direct targets of defendants' scheme were all United States end payers who paid for Cardizem CD during the Class Periods, from whom defendants knowingly derived almost all of the approximately $700-million-per-year benefit of their shared monopoly.  Indeed, in the first paragraph of a complaint which Andrx filed in an unrelated case on April 9, 2001 (Andrx Pharmaceuticals, Inc. v. Astra Aktiebolag, et al. No. 01 CV 2980 (S.D.N.Y.)), Andrx charged that Astra's use of the Hatch-Waxman Act's 30 month patent litigation stay provision to delay Andrx's launch of a generic version of Astra's prescription drug Prilosec would "harm millions of consumers in this state and across the country by preventing Andrx from marketing a lower-priced generic version . . . ."  Andrx later charged in paragraph 27 of the same complaint that, if Astra succeeded in delaying generic entry, "Astra's ill-gotten additional revenue, and the loss to Andrx and to consumers, will total billions of dollars."

(xix)   The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xx)   The benefits obtained by the Hoechst Defendants from the delay of generic entry rightfully belong to plaintiffs and the class, as plaintiffs and the class (as consumers and their

third party payers) were the target of the delay, as they were the market for the Cardizem CD and

its generic bioequivalent in the United States during both the Conspiracy and Monopolization

Class Periods.

(xxi)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of

the Hoechst-Andrx Agreement.

(xxii)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of

the additional revenue generated by plaintiffs' and the class' payments for Cardizem CD derived

from their unfair, unjust and unconscionable methods, acts and trade practices, including, but not

limited to, the Hoechst-Andrx Agreement, and the acts alleged herein designed to prevent the

introduction by Biovail and others of generic bioequivalents to Cardizem CD.

(xxiii)  The benefit referenced herein (both the Hoechst Defendants' additional Cardizem

CD revenues and the $89.86 million payment to Andrx under the Hoechst-Andrx Agreement)

should be disgorged to plaintiffs and the class.  Thereafter, all U.S. end payers should participate

in seeking restitution of their overpayments from the disgorged funds.

## FIFTH CLAIM FOR RELIEF

### (Action for Damages Under Arizona Revised Statutes Sections 44-1401 *et seq.*)

(xxiv)  Michigan plaintiff Aetna, which has been an Arizona end payer for Cardizem CD

and its generic bioequivalents during the Class Periods, repeats and realleges each and every

prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xxv)   With the specific intent to prevent competition from producers of generic

Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for

Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with

Andrx in the market for Cardizem CD and its generic bioequivalents in Arizona, the Hoechst

Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Arizona for Cardizem CD and its generic equivalents.

(xxvi)  The foregoing conduct violates Arizona Revised Statues §44-1401 *et seq.*

(xxvii) Plaintiff and the class seek the maximum civil damages permitted by law for these flagrant violations.

### SIXTH CLAIM FOR RELIEF

### (Action for Damages Under Nevada Revised Statute (NRS) Sections 598A.010 *et seq.*)

(xxviii) Michigan plaintiff Aetna, which has been a Nevada end payer for Cardizem CD and its generic bioequivalents during the Class Periods, repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xxix)  With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Nevada, the Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Nevada for Cardizem CD and its generic equivalents.

(xxx)   The foregoing conduct violates the Nevada Unfair Trade Practices Act, NRS § 598A.010 *et seq.*, including, without limitation, NRS § 598A.060.

(xxi)   Plaintiff and the class seek the maximum civil damages permitted by law for these flagrant violations.

## SEVENTH CLAIM FOR RELIEF

### (Action for Damages Under New Mexico Statutes
### Sections 57-1-1 et seq. and 57-12-1 *et seq.*)

(xxxii) Michigan plaintiff Aetna, which has been a New Mexico end payer for Cardizem
CD and its generic bioequivalents during the Class Periods, repeats and realleges each and every
prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xxiii)  With the specific intent to prevent competition from producers of generic
Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for
Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with
Andrx in the market for Cardizem CD and its generic bioequivalents in New Mexico, the
Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in
the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have
thereby succeeded in restraining trade in New Mexico for Cardizem CD and its generic
equivalents.

(xxxiv) The foregoing conduct violates the New Mexico Antitrust Act, N.M. State Ann. §
57-1-1 *et seq.* (1978) and the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 *et
seq.* (1978)

(xxxv) Plaintiff and the class seek the maximum civil damages permitted by law for these
flagrant violations.



## EIGHTH CLAIM FOR RELIEF

### (Action for Damages Under 10 Maine Revised Statutes Annotated (M.R.S.A.) Sections 1101 *et seq.* and 5 M.R.S.A. Sections 205-A *et seq.*)

(xxxvi) Michigan plaintiff Aetna, which has been a Maine end payer for Cardizem CD and its generic bioequivalents during the Class Periods, repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xxxvii) With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Maine, the Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Maine for Cardizem CD and its generic equivalents.

(xxxviii) The foregoing conduct violates Maine's "Mini-Sherman Act," 10 M.R.S.A. § 1101 *et seq.*, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. Section 205-A *et seq.*

(xxxix) Plaintiff and the class seek the maximum civil damages permitted by law for these flagrant violations.

## NINTH CLAIM FOR RELIEF

### (Action for Damages Under North Dakota Civil Code Sections 51-08.1-01 *et seq.*)

(xl) Michigan plaintiff Aetna, which has been a North Dakota end payer for Cardizem CD and its generic bioequivalents during the Class Periods, repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xli) With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD



and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in North Dakota, the Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in North Dakota for Cardizem CD and its generic equivalents.

(xlii) The foregoing conduct violates North Dakota CC §§ 51-08.1-01 *et seq.* (1999).

(xliii) Plaintiff and the class seek the maximum civil damages permitted by law for these flagrant violations.

### TENTH CLAIM FOR RELIEF

### <u>(Action for Damages Under Title 10, Laws of<br>Puerto Rico Annotated (LPRA) Sections 257-276)</u>

(xliii) Michigan plaintiff Aetna, which has been a Puerto Rico end payer for Cardizem CD and its generic bioequivalents during the Class Periods, repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xliv) With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Puerto Rico, the Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Puerto Rico for Cardizem CD and its generic equivalents.

(xlv) The foregoing conduct violates Title 10, LPRA §§ 257-276.

(xliii) Plaintiff and the class seek the maximum civil damages permitted by law for these flagrant violations.



### ELEVENTH CLAIM FOR RELIEF

### (<u>Action for Damages Under West Virginia Code §§ 47-18-1 *et seq.* and 46A-1-101 *et seq.*</u>)

(xlvii) Michigan plaintiff Aetna, which has been a West Virginia end payer for Cardizem CD and its generic bioequivalents during the Class Periods, repeats and realleges each and every prior allegation in this Complaint, with the same force and effect as if fully set forth herein.

(xlviii) With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in West Virginia, the Hoechst Defendants first monopolized, and then later engaged in a combination with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in West Virginia for Cardizem CD and its generic equivalents.

(xlix) The foregoing conduct violates the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*, and the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-1-101 *et seq.*

(l) Plaintiff and the class seek the maximum civil damages permitted by law for these flagrant violations.

### <u>JURY DEMAND</u>

Plaintiffs and the Class demand trial by jury on all claims for which there is a right to a jury trial.

 

G.    **Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft, _et al._** (D. Minn. Case No. 99-CV-124 (DWF/AJB)) (Michigan No. 99-CV-73239)

### FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Hoechst-Andrx Agreement Amounts To A _Per Se_ Violation Under Section 325D.51 of the Minnesota Statutes (Minnesota's Antitrust Law of 1971))

### (Against All Defendants)

(i)    Minnesota plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)    Minnesota's Antitrust Law of 1971, Minn. Stat. §§ 325D.51 and 325D.53, provide, in pertinent part:

> 325D.51.   A contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful.
>
> \*      \*      \*
>
> 325D.53   Price fixing; production control; allocation of markets; collusive bidding; and concerted refusals to deal; discriminatory acts
>
> Subdivision 1.   Without limiting section 325D.51, the following shall be deemed to restrain trade or commerce unreasonably are unlawful:
>
> (1) a contract, combination, or conspiracy between two or more persons in competition:
>
> \*      \*      \*
>
> > (b)  affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, . . . sale or supply of any commodity, . . . for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity . . . ; or
> >
> > (c)  allocating or dividing customers or markets, functional or geographical, for any commodity . . . .

 

(iii)   Minnesota's Antitrust Law of 1971, Minn. Stat. § 325D.54(b), also provides:

Sections 325D.49 to 325D.66 apply to:

\*       \*       \*

(b) any contract, combination, or conspiracy, wherever
created, formed, or entered into; any establishment,
maintenance, or use of monopoly power; and any attempt to
establish, maintain, or use monopoly power; whenever any
of the foregoing affects the trade or commerce of this state.

(iv)   Minnesota's Antitrust Law of 1971, Minn. Stat. § 325D.57, further provides:

Damages. Any person . . . injured directly or indirectly by a
violation of sections 325D.49 to 325D.66, shall recover three times
the actual damages sustained, together with costs and
disbursements, including reasonable attorneys' fees. . . .

(v)   The Hoechst-Andrx Agreement is an agreement between horizontal competitors

in the same chain of distribution, which has the effect of allocating market share and restraining

trade. Such an allocation is a classic example of a "contract, combination [and] conspiracy

between two or more persons in unreasonable restraint of trade" which is *per se* prohibited under

Minn. Stat. §§ 325D.51. The agreement is also a "contract, combination [and] conspiracy . . .

affecting, fixing, controlling, maintaining, limiting [and] discontinuing . . . the sale [and] supply

of [a] commodity . . . for the purpose of affecting, fixing, controlling [and] maintaining the

market price . . . of the commodity" and "allocates [and] divides customers [and] markets . . . for

a commodity", which is *per se* prohibited under Minn. Stat. §§ 325D.53(1)(b) & (c).

(vi)   Plaintiff and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil

Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement

is a *per se* violation of Minn. Stat. §§ 325D.51, 325D.53(1)(b) & (c).

 

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Sections 325D.51 and 325D.53 of Minnesota's Antitrust Law of 1971)

### (Against All Defendants)

(vii)    Minnesota plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(viii)    With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Minnesota, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in the State of Minnesota for Cardizem CD and its generic bioequivalents.

(ix)    The foregoing conduct violates the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49.

(x)    Plaintiff and the class seek the maximum damages permitted by law for their injuries caused by these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action For Damages Under Section 325D.52 and 325D.53 of Minnesota's Antitrust Law of 1971)

### (Against HMR and Hoechst)

(xi)    Minnesota plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xii)    The Minnesota Antitrust Law of 1971 § 325D.52 provides:

 

> The establishment, maintenance, or use of a monopoly, or any
> attempt to establish, maintain or use monopoly power over any part
> of trade or commerce by any person or persons for the purpose of
> affecting competition or controlling, fixing, or maintaining prices
> is unlawful.

(xiii)   The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of preventing the appearance of Biovail's generic version of Cardizem CD on the Cardizem CD and its generic bioequivalents market, which would reduce Cardizem CD's market share and prices paid by end-payer purchasers, including plaintiff.

(xiv)   The initiation and continued prosecution of the baseless Hoechst-Andrx Patent Case in the United States District Court for the Southern District of Florida were engaged in solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD to the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by end-payer purchasers, including plaintiff.

(xv)   Under the Minnesota Antitrust Law of 1971, § 325D.57, plaintiff and the class are entitled to three times the damages sustained by them as a result of the Hoechst Defendants' acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

### FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(xvi)   Minnesota plaintiff repeats and realleges each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

 

(xvii)   The Hoechst Defendants have benefitted from the overcharges they have been able to levy for Cardizem CD, resulting from acts alleged herein and the overpayments by plaintiff and the class for Cardizem CD.

(xviii)  Defendant Andrx has benefitted from the acts alleged in this Complaint to the extent of the payments ($89.86 million) it has received under the Hoechst-Andrx Agreement. The funds for such payments by Hoechst are derived from plaintiff's and the class' overpayments for Cardizem CD.

(xix)   Plaintiff and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiff's and the class' economic detriment.

(xx)    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xxi)   The benefit held by the Hoechst Defendants rightfully belongs to plaintiff and the class, as plaintiff and the class paid these anti-competitive sums to defendants during both the Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

(xxii)  It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(xxiii) It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiff's and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-

 

Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff and the class pray for judgment against all defendants, jointly and severally, as follows:

a.  declaring that the Hoechst-Andrx Agreement is a *per se* violation of Sections 325D.51 & 325D.53(1) of the Minnesota Antitrust Law of 1971;

b.  granting plaintiff and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

c.  awarding plaintiff and the class treble damages, jointly and severally, for defendants' violations of Sections 325D.51, 325D.52 and 325D.53(1) of the Minnesota Antitrust Law of 1971, in an amount to be determined at trial;

d.  granting plaintiff and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

e.  granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff and the class demand trial by jury on all claims for which there is a right to a jury trial.

 

H.   **D'Esposito, _et al._ v. Hoechst Aktiengesellschaft, _et al._** (S.D.N.Y. Case No. 99-CV-2088) (Michigan Case No. 99-CV-73713)

**Sunshine Pharmacy of New York, Inc. v. Hoechst Aktiengesellschaft, _et al._** (E.D.N.Y. Case No. 99-CV-1641) (Michigan No. 99-CV-73845)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Hoechst-Andrx Agreement Amounts To A _Per Se_ Violation Under Section 349 of the New York General Business Law ("Donnelly Act"))**

**(Against All Defendants)**

(i)   New York plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)   New York's Donnelly Act, § 340(1) of the General Business Law, provides, in pertinent part:

> 340.   Contracts or agreements for monopoly or in restraint of trade illegal and void
>
> (1) Every contract, agreement, arrangement or combination whereby a monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby be restrained or whereby
>
> For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void.

(iii)   New York's Donnelly Act, § 340(5) of the General Business Law, also provides:

> (5) An action to recover damages caused by a violation of this section must be commenced within four years after the cause of action has accrued. . . . . [A]ny person who shall sustain damages by reason of any violation of this section, shall recover three-fold the actual damages sustained thereby, as well as costs not exceeding ten thousand dollars, and reasonable attorneys' fees . . . .

 

(iv)     The Hoechst-Andrx Agreement is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.  Such an allocation is a classic example of a "contract, agreement, arrangement [and] conspiracy . . . whereby a monopoly in the conduct of business, trade [and] commerce is established . . ." which is *per se* prohibited under The Donnelly Act, General Business Law § 340(1).

(v)     Plaintiffs and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement is a *per se* violation of The Donnelly Act, General Business Law § 340(1).

**SECOND CLAIM FOR RELIEF**

**(Action For Damages Under Sections 340 and 349 of The Donnelly Act)**

**(Against All Defendants)**

(vi)     New York plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(vii)     With the specific intent to prevent competition from other producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in New York, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in the State of New York.

(viii)     The foregoing conduct violates The Donnelly Act, New York General Business Law § 340 *et seq.*, and New York General Business Law § 349.

 

(ix)    Plaintiffs and the class seek the maximum damages permitted by law for their injuries caused by these violations.

### THIRD CLAIM FOR RELIEF

### (Restitution for Unjust Enrichment)

### (Against All Defendants)

(x)    New York plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xi)    The Hoechst Defendants have benefitted from the overcharges they have been able to levy for Cardizem CD, resulting from acts alleged herein and the overpayments by plaintiffs and the class for Cardizem CD.

(xii)    Defendant Andrx has benefitted from the acts alleged in this Complaint to the extent of the payments it has received under the Hoechst-Andrx Agreement.  The funds for such payments by Hoechst are derived from plaintiffs' and the class' overpayment for Cardizem CD.

(xiii)    Plaintiffs and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiffs' and the class' economic detriment.

(xiv)    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xv)    The benefit held by the Hoechst Defendants rightfully belongs to plaintiffs and the class, as plaintiffs and the class paid these anti-competitive sums to defendants during both the Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

 

(xvi)   It would be inequitable for Andrx to be permitted to retain any of the $89,860,000 it received under the Hoechst-Andrx Agreement.

(xvii)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiffs' and the class' overpayment for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

(xviii)   By reason of the foregoing, defendants should disgorge such inequitably obtained funds to plaintiffs and the class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the class pray for judgment against all defendants, jointly and severally, as follows:

a.   declaring that the Hoechst-Andrx Agreement is a *per se* violation of Section 340(1) of the Donnelly Act, New York General Business Law;

b.   granting plaintiffs and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

c.   awarding plaintiffs and the class treble damages, jointly and severally, for defendants' violations of Sections 340(1) of the Donnelly Act, New York General Business Law, in an amount to be determined at trial;

d.   granting plaintiffs and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

e.   granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the class demand trial by jury on all claims for which there is a right to a jury trial.

1369 / CMP / 00050022.WPD v1                                   87

 

I.  **Glover, _et al._ v. Hoechst Aktiengesellschaft, _et al._** (W.D.N.C. Case No. 3:99-CV-169-H) (Michigan No. 99-CV-74377)

### FIRST CLAIM FOR RELIEF

**(Declaratory Judgment That the Market Allocation Agreement Amounts To A _Per Se_ Violation Under Sections 75-1, 75-1.1 and 75-2 of North Carolina General Statutes and Article I, Section 34 of the North Carolina Constitution)**

**(Against All Defendants)**

(i)      North Carolina plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(ii)      North Carolina General Statutes § 75-1 provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal.  Every person or corporation who shall make any such contract expressly or shall knowingly be a party thereto by implication, or who shall engage in any such combination and conspiracy shall be guilty of a  Class H felony.

(iii)      North Carolina General Statutes § 75-1.1 also provides:

> It is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize, any part of trade or commerce in the State of North Carolina.

(iv)      North Carolina General Statutes § 75-2 further provides:

> Any act, contract, combination in the form of trust, or conspiracy in restraint of trade or commerce which violates the principles of the common law is hereby declared to be in violation of G.S. § 75-1.

(v)      North Carolina General Statutes § 75-8 further provides:

> Where the things prohibited in this Chapter are continuous, then in such event, after the first violation of such provision hereof, each week that the violation of such provision shall continue shall constitute a separate offense.

 

(vi)     North Carolina General Statutes § 75-16 further provides:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

(vii)    Article I, Section 34 of the North Carolina Constitution provides:

> Perpetuities and monopolies are contrary to the genius of a free state and shall not be allowed.

(viii)   The Hoechst-Andrx Agreement is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.  Such an allocation is a classic example of a "contract [and] combination in the form of a trust . . . [and] conspiracy in restraint of trade [and] commerce . . ." which is *per se* prohibited under North Carolina General Statutes §  75-1.  Further, this agreement is a "combin[ation] and conspir[acy] . . . to monopolize . . . trade [and] commerce . . .", which is *per se* prohibited under North Carolina General Statutes § 75-1.1.  Further, as such agreements were illegal under common law and constitute a monopoly, the Hoechst-Andrx Agreement is *per se* illegal under North Carolina General Statutes § 75-2 and Article I, Section 34 of the North Carolina Constitution.

(ix)     Plaintiffs and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement is a *per se* violation of North Carolina General Statutes §§ 75-1, 75-1.1 and 75-2 and Article I, Section 34 of the North Carolina Constitution.

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under North Carolina General Statutes §§ 75-1, 75-1.1, 75-2 and Article I, Section 34 of the North Carolina Constitution)

### (Against All Defendants)

(x)     North Carolina plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xi)     With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to create thereafter a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in North Carolina, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in North Carolina for Cardizem CD and its generic bioequivalents.

(xii)     The foregoing conduct violates North Carolina General Statutes §§ 75-1 *et seq.*, and Article 1, Section 34 of the North Carolina Constitution.

(xiii)     Plaintiffs and the class seek actual damages for their injuries caused by these violations in an amount to be determined at trial, and are entitled to have such damages trebled pursuant to North Carolina General Statute § 75-16.

(xiv)     Defendants' willful acts and conduct, as described above, amount to an unwarranted refusal to fully resolve the matter which constitutes the basis of this lawsuit, and as such, entitle plaintiffs and the class to an award of attorneys' fees pursuant to North Carolina General Statute § 75-16.

 

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under North Carolina General Statutes § 75-1.1 and Article I, Section 34 of the North Carolina Constitution)

### (Against HMR and Hoechst)

(xv)   North Carolina plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xvi)   The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of preventing the appearance of Biovail's generic version of Cardizem CD on the Cardizem CD and its generic bioequivalents market, which would reduce Cardizem CD's market share and prices paid by end-payer purchaser, including plaintiffs.

(xvii)   The initiation and continued prosecution of the baseless Hoechst-Andrx Patent Case in the United States District Court for the Southern District of Florida were engaged in solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD to the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by third-party payers, including plaintiffs.

(xviii)   Under North Carolina General Statutes §§ 75-16 & 75-16.1, plaintiffs and the class are entitled to three times the damages sustained by them as a result of the Hoechst Defendants' acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

## FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(xix)    North Carolina plaintiffs repeat and reallege each and every prior allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xx)    The Hoechst Defendants have knowingly accepted and benefitted from the overcharges they have been able to levy for Cardizem CD resulting from acts alleged herein and overpayments by plaintiffs and the class for Cardizem CD.

(xxi)    Defendant Andrx has benefitted from the acts alleged in this Complaint to the extent of the $89,860,000 it has received under the Hoechst-Andrx Agreement.  The funds for such payments by the Hoechst Defendants are derived from plaintiffs' and the class' overpayments for Cardizem CD.

(xxii)    Plaintiffs and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiffs' and the class' economic detriment.

(xxiii)    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xxiv)    The benefit held by the Hoechst Defendants rightfully belongs to plaintiffs and the class, as plaintiffs and the class paid these anti-competitive sums to defendants during both the Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

(xxv)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(xxvi)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiffs' and the class' overpayment for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the class pray for judgment against all defendants, jointly and severally, as follows:

a.   declaring that the Hoechst-Andrx Agreement is a *per se* violation of North Carolina General Statute §§ 75-1, 75-1.1 & 75-2 and Article 1, Section 34 of the North Carolina Constitution;

b.   granting plaintiffs and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

c.   awarding plaintiffs and the class treble damages, jointly and severally, for defendants' violation of North Carolina General Statutes §§ 75-1, 75-1.1 & 75-2, in an amount to be determined at trial;

d.   granting plaintiffs and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

e.   granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the class demand trial by jury on all claims for which there is a right to a jury trial.

 

J.   **Eugenia Wynne Sams v. Hoechst Aktiengesellschaft, _et al._** (E.D. Tenn. Case No.
2:98-CV-348 (TGH)) (Michigan No. 99-CV-73190)

**Larry S. Sizemore v. Hoechst Aktiengesellschaft, _et al._** (E.D. Tenn. Case No. 3:99-
CV-42) (Michigan No. 99-CV-73345)

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment That the Market Allocation Agreement Amounts To A _Per Se_ Violation of the Tennessee Trade Practices Act Sections 47-25-101 and 47-25-102 of the Tennessee Code)

### (Against All Defendants)

(i)      Tennessee plaintiffs repeat and reallege each and every prior allegation of this

Complaint with the same force and effect as if fully set forth herein.

(ii)      The Tennessee Trade Practices Act, Tennessee Code § 47-25-101, provides, in

pertinent part:

> 47-25-101.  Trusts, etc., lessening competition or controlling prices
> unlawful and void
>
> All arrangements, contracts, agreements, trusts, or combinations
> between persons or corporations made with a view to lessen, or
> which tend to lessen, full and free competition in the importation
> or sale of articles imported into this state, . . . and all arrangements,
> contracts, agreements, trusts or combinations between persons or
> corporations designed, or which tend, to advance, reduce, or
> control the price or the cost to the producer or the consumer of any
> such product or article, are declared to be against public policy,
> unlawful, and void.

(iii)      The Tennessee Trade Practices Act, Tennessee Code § 47-25-102, also

provides, in pertinent part:

> 47-25-102.  Price fixing agreement unlawful and void
>
> Any arrangements, contracts, and agreements . . . by any
> [corporation or person, or] by and between its agents and
> subagents, which tend to lessen full and free competition in the
> sale of all such articles manufactured and imported into the state,
> and which amount to a subterfuge for the purpose of obtaining the

 

same advantage and purposes are declared to be against public policy, unlawful, and void.

(iv)    The Tennessee Trade Practices Act, Tennessee Code 47-25-102, further

provides:

> All persons and corporations, and the officers and the stockholders of all corporations, that become or continue to be members of, or in any way connected with or concerned in, any such trust, contract, agreement, or combination, shall be jointly and severally liable to pay all the debts, obligations, and liabilities of each and every person and corporation that became or continued to be a member thereof, connected therewith, or concerned, therein, as fully as if all were partners in the creation of such debts, obligations, and liabilities.

(v)     Tennessee Code § 47-25-106 further provides:

> 47-25-106.  Recovery of consideration as remedy for damages

> Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

(vi)    The Hoechst-Andrx Agreement is an agreement between horizontal competitors

in the same chain of distribution, which has the effect of allocating market share and restraining

trade.  Such an allocation is a classic example of an "arrangement[ ], contract[ ], [and]

agreement[ ] . . . which tend[s] to lessen[ ] full and free competition . . ." which is *per se*

prohibited under Tennessee Code §§ 47-25-101 & 47-25-102.

(vii)   Plaintiffs and the class, therefore, pursuant to Rule 57 of the Federal Rules of

Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx

Agreement is a *per se* violation of Tennessee Code §§ 47-25-101 & 47-25-102.

 

## SECOND CLAIM FOR RELIEF

### (Action For Damages Under Sections 47-25-101 & 47-25-102 of the Tennessee Code)

### (Against All Defendants)

(viii)    Tennessee plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

(ix)    With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shared monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Tennessee, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Tennessee for Cardizem CD and its generic bioequivalents.

(x)    The foregoing conduct violates Tennessee Code §§ 47-25-101 & 47-25-102.

(xi)    Plaintiffs and the class seek the maximum damages permitted by law for their injuries caused by these flagrant violations.

## THIRD CLAIM FOR RELIEF

### (Action for Damages Under the Tennessee Consumer Practices Act of 1977)

### (Against the Hoechst Defendants)

(xii)    Tennessee plaintiffs repeat and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xiii)    The Tennessee Consumer Practices Act of 1977, Tennessee Code § 47-18-104 provides, in pertinent part:

 

    (a)     Unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts and practices and are Class B misdemeanors . . . .

(xiv)    The Tennessee Consumer Practices Act of 1977, Tennessee Code § 47-18-104, further provides, in pertinent part:

    (a)    (1)    Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

* * *

    (3)    If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.

    (4)    In determining whether treble damages should be awarded, the trial court may consider, among other things:

    (A)    The competence of the consumer or other person;

    (B)    The nature of the deception or coercion practiced upon the consumer or other person;

    (C)    The damage to the consumer or other person; and

    (D)    The good faith of the person found to have violated the provisions of this part . . . .

(xv)    The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference (*see supra*) was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of delaying the entry of Biovail's and others' generic versions of Cardizem CD onto the market for Cardizem CD and its generic bioequivalents, which would have reduced

 

Cardizem CD's market share and the prices paid by third-party payers, pharmacies and others, including plaintiffs.

(xvi)   The continuation of the baseless litigation against Andrx in the United States District Court for the Southern District of Florida under a patent that did not cover the dissolution profile claimed in Andrx's amended ANDA filed with the FDA (*see supra*) was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD onto the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by third-party payers, pharmacies and others, including plaintiffs.

(xvii)   Under the Tennessee Code § 47-18-109(a), plaintiffs and the class are entitled to three times the damages sustained by them as a result of the Hoechst Defendants' willful and knowing acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.

### FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(xviii)  Tennessee plaintiffs repeat and reallege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

(xix)   The Hoechst Defendants have knowingly accepted and benefitted from the overcharges they have been able to levy for Cardizem CD, resulting from acts alleged herein and the overpayments by plaintiffs and the class for Cardizem CD.

(xx)     Defendant Andrx has benefitted from the acts alleged in this Complaint to the extent of the $89,860,000 it has received under the Hoechst-Andrx Agreement.  The funds for

 

such payments by Hoechst are derived from plaintiffs' and the class' overpayments for Cardizem CD.

(xxi)   Plaintiffs and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiffs' and the class' economic detriment.

(xxii)   The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xxiii)   The benefit held by the Hoechst Defendants rightfully belongs to plaintiffs and the class, as plaintiffs and the class paid these anti-competitive sums to defendants during both the Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

(xxiv)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(xxv)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiffs and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs and the class pray for judgment against all defendants, jointly and severally, as follows:

a.       declaring that the Hoechst-Andrx Agreement is a *per se* violation of Tennessee Code §§ 47-25-101 & 47-25-102;

 

b. granting plaintiffs and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

c. awarding plaintiffs and the class damages, jointly and severally, for defendants' violation of Tennessee Code §§ 47-25-101 & 47-25-102, in an amount to be determined at trial;

d. awarding plaintiffs and the class actual and treble damages, jointly and severally, for defendants' willful and knowing violation of Tennessee Code §§ 47-18-104 & 47-25-102, in an amount to be determined at trial;

d. granting plaintiffs and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

e. granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs and the class demand trial by jury on all claims for which there is a right to a jury trial.

**K.** <u>**United Wisconsin Services, Inc., et al., v. Hoechst Aktiengesellschaft, et al.**</u>
**(E.D.Wisc. Case No. 99-CV-389) (Michigan No. 99-CV-73666)**

<u>**Albert Eirich v. Hoechst Aktiengesellschaft, et al.**</u> **(E.D.Wisc. Case No. 2:98-1027 (FTW)) (Michigan No. 99-CV-73981)**

### FIRST CLAIM FOR RELIEF

### (<u>Declaratory Judgment That the Market Allocation Agreement Amounts To A *Per Se* Violation Under Sections 133.03 & 133.14 of Wisconsin Statutes</u>)

### (<u>Against All Defendants</u>)

(i) Wisconsin plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

(ii) Wisconsin Statutes § 133.01 provides:

The intent of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business

 

practices which destroy or hamper competition. It is the intent of the legislature that this chapter be interpreted in a manner which gives the most liberal construction to achieve the aim of competition. It is the intent of the legislature to make competition the fundamental economic policy of this state . . . .

(ii)     Wisconsin Statutes § 133.03 also provides, in pertinent part:

(1) Every contact, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal. . . .

(2) Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce may [be subject to fines and imprisonment].

(iii)     Wisconsin Statutes § 133.14 further provides, in pertinent part:

All contracts or agreements made by a person while a member of any combination or conspiracy prohibited by § 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no recovery thereon or benefit therefrom may be had by or for such person. . . ..

(iv)     Wisconsin Statutes § 133.18 also provides, in pertinent part,:

(1)(a)  Except as provided under ¶ (b), any person injured, directly or indirectly, by reason of anything prohibited by this chapter may sue therefor and shall recover threefold the damages sustained by the person and the cost of the suit, including reasonable attorney fees. . . .

(v)     The Hoechst-Andrx Agreement  is an agreement between horizontal competitors in the same chain of distribution, which has the effect of allocating market share and restraining trade.  Such an allocation is a classic example of a "contract, combination in the form of a trust . . . [and] conspiracy[] in restraint of trade [and] commerce . . ." which is *per se* prohibited under Wisconsin Statutes §§ 133.03(1) & (2).

 

(vi)      Plaintiffs and the class, therefore, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaration that the Hoechst-Andrx Agreement is a *per se* violation of Wisconsin Statutes §§ 133.03(1) & (2).

### SECOND CLAIM FOR RELIEF

### <u>(Action For Damages Under Wisconsin Statutes §§ 133.03(1) & (2))</u>

### <u>(Against All Defendants)</u>

(vii)     Wisconsin plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

(viii)    With the specific intent to prevent competition from producers of generic Cardizem CD and thereby maintain the Hoechst Defendants' monopoly over the market for Cardizem CD and its generic bioequivalents and to thereafter create a shares monopoly with Andrx in the market for Cardizem CD and its generic bioequivalents in Wisconsin, the Hoechst Defendants first monopolized, and then later combined with Andrx in the form of a trust and a conspiracy, as evidenced by the Hoechst-Andrx Agreement, and have thereby succeeded in restraining trade in Wisconsin for Cardizem CD and its generic bioequivalents.

(ix)      The foregoing conduct violates Wisconsin Statutes §§ 133.03(1) & (2), 133.14 and contravenes the legislative intent set forth in Wisconsin Statutes § 133.01.

(x)       Plaintiffs and the class seek the maximum damages permitted by law for their injuries caused by these violations.

 

### THIRD CLAIM FOR RELIEF

#### (Action for Damages Under Wisconsin Statutes §133.03(2))

#### (Against HMR and Hoechst)

(xi)     Wisconsin plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

(xii)     The Hoechst Defendants' baseless renunciation of the FTC-mandated right of reference was unfair, fraudulent, unreasonable and dishonest conduct performed solely for the purpose of preventing the appearance of Biovail's generic version of Cardizem CD on the Cardizem CD and its generic bioequivalents market, which would reduce Cardizem CD's market share and prices paid by end-payer purchasers, including plaintiffs.

(xiii)     The initiation and continued prosecution of the baseless Hoechst-Andrx Patent Case in the United States District Court for the Southern District of Florida was baseless and engaged in solely for the purpose of delaying the entry of Andrx's and others' generic versions of Cardizem CD onto the market for Cardizem CD and its generic bioequivalents, which would have reduced Cardizem CD's market share and the prices paid by end-payer purchasers, pharmacies and consumers, including plaintiffs.

(xiv)     Under Wisconsin Statutes § 133.18, plaintiffs and the class are entitled to three times the damages sustained by them as a result of the Hoechst Defendants' acts referenced herein, interest thereon, and reasonable attorneys' fees and costs of the suit.



## FOURTH CLAIM FOR RELIEF

### (Restitution For Unjust Enrichment)

### (Against All Defendants)

(xv)     Wisconsin plaintiffs repeat and reallege each and every allegation of this Complaint with the same force and effect as if fully set forth herein.

(xvi)    The Hoechst Defendants have knowingly accepted and benefitted from the overcharges they have been able to levy for Cardizem CD resulting from acts alleged herein and overpayments by plaintiffs and the class for Cardizem CD.

(xvii)   Defendant Andrx has benefitted from the acts alleged in this Complaint to the extent of the payments ($89.86 million) it has received under the Hoechst-Andrx Agreement. The funds for such payments by Hoechst are derived from plaintiffs' and the class' overpayments for Cardizem CD.

(xviii)  Plaintiffs and the class have conferred upon both the Hoechst Defendants and Andrx an economic benefit in the nature of revenues resulting from unlawful overcharges, to plaintiffs' and the class' economic detriment.

(xix)    The economic benefit of overcharges obtained by supra-competitive prices is a direct and proximate cause of defendants' anticompetitive behavior restricting competition as set forth above.

(xx)     The benefit held by the Hoechst Defendants rightfully belongs to plaintiffs and the class, as plaintiffs and the class paid these anti-competitive sums to defendants during both the Conspiracy and Monopolization Class Periods, when the Hoechst Defendants, and later Andrx, used anti-competitive measures to block generic entry into the market.

 

(xxi)   It would be inequitable for Andrx to be permitted to retain any of the proceeds of the Hoechst-Andrx Agreement.

(xxii)   It would be inequitable for the Hoechst Defendants to be permitted to retain any of plaintiffs and the class' overpayments for Cardizem CD derived from their unfair and unconscionable methods, acts and trade practices, including, but not limited to, the Hoechst-Andrx Agreement, and the other acts alleged herein regarding efforts to prevent the introduction by Biovail and others of generic bioequivalents to Cardizem CD.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs and the class pray for judgment against all defendants, jointly and severally, as follows:

a.   declaring that the Hoechst-Andrx Agreement is a *per se* violation of Wisconsin Statutes §§ 133.03(1) & (2);

b.   granting plaintiffs and the class equitable relief in the nature of disgorgement and/or restitution of defendants' unjust enrichment;

c.   awarding plaintiffs and the class treble damages, jointly and severally, for defendants' violations of Wisconsin Statutes §§ 133.03(1) & (2) & 133.14, in an amount to be determined at trial;

d.   granting plaintiffs and the class the costs of prosecuting this action, together with interest and reasonable attorneys' fees and costs; and

e.   granting such other relief as this Court may deem just and proper under the circumstances.

## **JURY DEMAND**

Plaintiffs and the class demand trial by jury on all claims for which there is a right to a jury trial.

Dated: July 6, 2001

Respectfully submitted,

ELWOOD S. SIMON & ASSOCIATES

By: _____
     Elwood S. Simon, Esq.
     Lance C. Young, Esq.
355 South Old Woodward Avenue, Suite 250
Birmingham, MI  48009
Tel.: (248) 646-9730
Fax. (248) 258-2335

*Liaison Counsel for State Law Cases*

LOWEY DANNENBERG BEMPORAD
   & SELINGER, P.C.

By: _____
     Stephen Lowey
     Richard W. Cohen
     Peter St. Phillip
The Gateway, 11th Floor
One North Lexington Avenue
White Plains, NY  10601
Tel.:  (914) 997-0500
Fax.: (914) 997-0035

*Counsel for United Wisconsin Services, Inc.,
Aetna U.S. Healthcare, Inc., and Aetna California
and*

*Co-Lead Plaintiffs' Counsel for All State Law
Classes*



Joseph Tabacco
Jennifer Abrams
BERMAN DEVALERIO PEASE & TABACCO
425 California Street, Suite 2025
San Francisco, CA  94104
Tel.: (415) 433-3200
Fax: (415) 433-6382

*Counsel for Aetna U.S. Healthcare, Inc. and Aetna
California
and*
**Co-Lead Plaintiffs' Counsel for All State Law
Classes**

John Innelli
Michael Molder
INNELLI & MOLDER
325 Chestnut Street, Suite 903
Philadelphia, PA  19106
Tel.: (215) 627-3394
Fax: (215) 627-3397

*Counsel for Aetna U.S. Healthcare, Inc. and
Aetna California*

Andy D. Birchfield, Jr.
BEASLEY WILSON ALLEN CROW &
 METHVIN, P.C.
218 Commerce Street
Montgomery, AL  36104
Tel.: (334) 269-2343
Fax.: (334) 269-0849

*Counsel for Billy Joe Lightner, Lomax Stanford,
Janoka, Inc. d/b/a The Medicine Shoppe and
          Frederick Mark Flegal*

Robert S. Schachter
Joseph S. Tusa
ZWERLING SCHACHTER &
 ZWERLING, L.L.P.
767 Third Avenue
New York, NY  10017-2023
Tel.: (212) 223-3900
Fax.: (212) 371-5969

*Counsel for Joseph D'Esposito*



Patrick E. Cafferty
MILLER FAUCHER CAFFERTY
  & WEXLER
101 North Main Street, Suite 570
Ann Arbor, MI  48104
Tel: 734-769-2144
Fax: 734-769-1207

*Counsel for Charles Zuccarini and Jan Gabriel*

T. Paul S. Chawla
POPUCH CHAWLA & GABE
907 North Elm Avenue, Suite 100
Hinsdale, IL  60521
Tel: 630-325-5557

*Counsel for Jan Gabriel*

Marvin A. Miller
Jennifer Sprengel
MILLER FAUCHER CAFFERTY
  & WEXLER, P.L.L.P.
30 North LaSalle Street, Suite 3200
Chicago, IL  60602
Tel: 312-782-4880
Fax: 312-782-4485

*Counsel for Jan Gabriel and Albert Eirich*

Michael J. Cohen
ZETLEY & COHEN, S.C.
324 East Wisconsin Avenue, Suite 1400
Milwaukee, WI  53202
Tel.: (414) 272-1424
Fax.: (414) 272-1435

*Local Counsel for Albert Eirich*



Bernard Persky
Barbara J. Hart
GOODKIND LABATON RUDOFF
  & SUCHAROW, L.L.P.
100 Park Avenue
New York, NY  10017-5563
Tel. (212) 907-0700
Fax. (212) 818-0477

*Counsel for Joseph D'Esposito*

Richard A. Lockridge
Heidi Drewes-Silton
LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel.: (612) 339-6900
Fax.: (612) 339-0981

*Local Counsel for Aetna U.S. Healthcare, Inc.*

Jack C. Sando
4922A St. Elmo Boulevard
Bethesda, MD  20814-6032
Tel.: (301) 986-0818
Fax.: (301) 907-0965

*Local Counsel for Aetna U.S. Healthcare, Inc.*

Robert Corris
735 North Water Street, Suite 1440
Milwaukee, WI  53202
Tel.: (414) 272-8000
Fax.: (414) 272-8050

*Local Counsel for United Wisconsin Services, Inc.*

Darren Dawson
Marvin Blount, Jr.
The Blount Law Firm
400 West First Street
Greenville, NC  27835
Tel.: (252) 752-6000
Fax.: (252) 752-2174

*Counsel for Shirlean Glover*



Gordon Ball
550 West Main Avenue
Nationsbank Center, Suite 750
Knoxville, TN  37902
Tel.: (423) 525-7028
Fax.: (423) 525-4679

*Counsel for Eugenia Wynne Sams*
*and Larry Sizemore*

Fred T. Isquith
Michael Jaffe
WOLF HALDENSTEIN ADLER FREEMAN
  & HERTZ, L.L.P.
270 Madison Avenue
New York, NY  10016
Tel.: (212) 545-4600
Fax.: (212) 545-4653

*Counsel for Sunshine Pharmacy of New York, Inc.*

David J. Bershad
Kenneth J. Vianale
Jack Reise
MILBERG WEISS BERSHAD HYNES &
  LERACH
5355 Town Center Road, Suite 900
Boca Raton, FL  33486
Tel: 561-361-5000
Fax: 561-361-8400

*Counsel for Larry S. Sizemore*

Michael Hausfeld
Daniel Small
Sharon Snyder
COHEN MILSTEIN HAUSFELD & TOLL
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, D.C.  20005-3934
Tel:  202-408-4600
Fax:  202-408-4699

*Counsel for Eugenia Wynne Sams*



James C. Krause
Patrick Keegan
Krause & Kalfayan
1010 Second Avenue, Suite 1750
San Diego, CA  92101
Tel:  619-232-0331
Fax:  619-232-4019

*Counsel for Galloway, Inc. & Merit Aid Pharmacy
and Medical Supply*

Kenneth G. Gilman
John C. Martland
Daniel D'Angelo
GILMAN & PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA  01906
Telephone No.:  781/231-7850

*Counsel for Marshall J. Ross*

H:\HOME\FILES\CARDIZEM\DOWNLOAD\3rdAmendedComplaint.wpd



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CARDIZEM CD                    )        MASTER FILE NO. 99-MD-1278
ANTITRUST LITIGATION                  )        MDL NO. 1278
                                      )        HON. NANCY G. EDMUNDS
                                      )
_____           )
                                      )
This Document Relates To:             )
                                      )
_____           )
                                      )
BILLY JOE LIGHTNER, LOMAX STANFORD,   )        UNITED STATES DISTRICT
JANOKA, INC. d/b/a THE MEDICINE       )        COURT for the MIDDLE
SHOPPE, and FREDERICK MARK FLEGAL,    )        DISTRICT OF ALABAMA
on behalf of themselves and all others similarly )
situated,                             )        Local Case No.:
                                      )        CV-99-T-754 (MHT)
                                      )
                    Plaintiffs,       )        Michigan No.: 99-CV-75070  *25*
                                      )
       - against -                    )
                                      )
HOECHST AKTIENGESELLSCHAFT,           )
HOECHST MARION ROUSSEL, INC., and     )
ANDRX PHARMACEUTICALS, INC.,          )
                                      )
                    Defendants.       )
_____           )
                                      )
BETNOR, INC., d/b/a RELIABLE DRUG     )        UNITED STATES DISTRICT
CENTER, and BETTY MORRIS, on behalf of )       COURT for the NORTHERN
themselves and all others similarly situated, )  DISTRICT OF CALIFORNIA
                                      )
                    Plaintiffs,       )        Local Case No.:
                                      )        3:98-CV-3609 (MHP)
       - against -                    )
                                      )        Michigan No.: 99-CV-73422  *39*
HOECHST AKTIENGESELLSCHAFT,           )
HOECHST MARION ROUSSEL, INC., and     )
ANDRX PHARMACEUTICALS, INC.,          )
                                      )
                    Defendants.       )
_____           )

[caption continued on following page]

*Attach to 478*

FILED
2001 JUL -6 P 3:49
U.S. DIST COURT CLERK
EASTERN DIST. MICHIGAN

AETNA U.S. HEALTHCARE, INC., and
AETNA U.S. HEALTHCARE OF
CALIFORNIA, INC., on behalf of themselves
and all others similarly situated,

                Plaintiffs,

      - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the NORTHERN
DISTRICT OF CALIFORNIA

Local Case No.:
98-CV-4729 (MHP)

Michigan No.: 99-CV-73412  *14*

---

GALLOWAY, INC., and MERIT AID
PHARMACY & MEDICAL SUPPLY, on behalf
of themselves and all others similarly situated,

                Plaintiffs,

      - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the SOUTHERN
DISTRICT OF CALIFORNIA

Local Case No.:
99-CV-0645 TW (JAH)

Michigan No.: 99-CV-73871  *21*

---

AETNA U.S. HEALTHCARE, INC., on behalf
of itself and all others similarly situated,

                Plaintiff,

      - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the DISTRICT OF
THE DISTRICT OF COLUMBIA

Local Case No.: 1:99-CV-193 (RCL)

Michigan No.: 99-CV-74262  *14*

[caption continued on following page]

JAN GABRIEL, on behalf of himself and all
others similarly situated,

          Plaintiff,

    - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the NORTHERN
DISTRICT OF ILLINOIS

Local Case No.: 98-C-7147 (ACW)

Michigan No.: 99-CV-73667

---

MARSHALL J. ROSS, on behalf of himself and
all others similarly situated,

          Plaintiff,

    - against -

HOECHST MARION ROUSSEL, INC.,
CARDERM CAPITAL L.P., ANDRX
CORPORATION and AVENTIS PHARMA AG,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT FOR THE DISTRICT
OF MASSACHUSETTS

Local Case No.: 00-CV-12312

Michigan No.: 01-CV-70490

---

CHARLES ZUCCARINI and AETNA U.S.
HEALTHCARE, on behalf of themselves
and all others similarly situated,

          Plaintiffs,

    - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the EASTERN
DISTRICT OF MICHIGAN,
SOUTHERN DIVISION

Case No.: 98-CV-74043 (NGE)

[caption continued on following page]

AETNA U.S. HEALTHCARE, INC., on behalf
of itself and all others similarly situated,

    Plaintiff,

  - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the DISTRICT OF
MINNESOTA

Local Case No.: 99-CV-124 (DWF/
AJB)

Michigan No.: 99-CV-73239    *19*

---

SUNSHINE PHARMACY OF NEW YORK,
INC., on behalf of itself and all others similarly
situated,

    Plaintiff,

  - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the EASTERN
DISTRICT OF NEW YORK

Local Case No.: 99-CV-1641 (RAD)

Michigan No.: 99-CV-73845    *15*

---

JOSEPH D'ESPOSITO and AETNA U.S.
HEALTHCARE, INC., on behalf of themselves and
all others similarly situated,

    Plaintiffs,

  - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

UNITED STATES DISTRICT
COURT for the SOUTHERN
DISTRICT OF NEW YORK

Local Case No.: 99-CV-2088 (BDP)

Michigan No.: 99-CV-73713    *14*

[caption continued on following page]

|  |  |
|---|---|
| ALBERT EIRICH, on behalf of himself and all others similarly situated, | UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF WISCONSIN |
| Plaintiff, | |
| | Local Case No.: 2:98-1027 (FTW) |
| - against - | |
| | Michigan No.: 99-CV-73981 *13* |
| HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC., | |
| Defendants. | |

|  |  |
|---|---|
| UNITED WISCONSIN SERVICES, INC., *et al.*, on behalf of themselves and all others similarly situated, | UNITED STATES DISTRICT COURT for the EASTERN DISTRICT OF WISCONSIN |
| Plaintiffs, | |
| | Local Case No.: 99-CV-389 |
| - against - | |
| | Michigan No.: 99-CV-73666 *12* |
| HOECHST AKTIENGESELLSCHAFT, HOECHST MARION ROUSSEL, INC., and ANDRX PHARMACEUTICALS, INC., | |
| Defendants. | |

FILED
2001 JUL -6 P 3:49
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

## AFFIDAVIT OF MAILING

STATE OF MICHIGAN      )
                                       )ss.
COUNTY OF OAKLAND    )


    HOLLY L. McINTYRE, being first duly sworn, deposes and says that on July 6, 2001,

she caused copies of Coordinated Third Amended Class Action Complaints, to be served upon:

SHIRLEAN GLOVER and AETNA U.S.
HEALTHCARE, INC., on behalf of themselves
and all others similarly situated,

              Plaintiffs,

      - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

              Defendants.

UNITED STATES DISTRICT
COURT for the WESTERN
DISTRICT OF NORTH CAROLINA

Local Case No.: 3:99-CV-00169-H

Michigan No.: 99-CV-74377

---

EUGENIA WYNNE SAMS, on behalf of
herself and all others similarly situated,

              Plaintiff,

      - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

              Defendants.

UNITED STATES DISTRICT
COURT for the EASTERN
DISTRICT OF TENNESSEE

Local Case No.: 2:98-CV-348

Michigan No.: 99-CV-73190

---

LARRY S. SIZEMORE, on behalf of himself
all others similarly situated,

              Plaintiff,

      - against -

HOECHST AKTIENGESELLSCHAFT,
HOECHST MARION ROUSSEL, INC., and
ANDRX PHARMACEUTICALS, INC.,

              Defendants.

UNITED STATES DISTRICT
COURT for the MIDDLE
DISTRICT OF TENNESSEE

Local Case No.: 3:99-CV-42

Michigan No.: 99-CV-73345

[caption continued on following page]



| | |
|---|---|
| Joseph Rebein, Esq.<br>**SHOOK, HARDY & BACON LLP**<br>One Kansas City Place<br>1200 Main Street<br>Kansas City, MO 64105<br>Tel: 816-474-6550<br>Fax: 816-421-5547<br>*Attorneys for Hoechst Aktiengesellschaft;*<br>*Aventis Pharmaceuticals Inc.* | Craig L. John, Esq.<br>Kimberly Gough Bickersteth, Esq.<br>**DYKEMA GOSSETT PLLC**<br>39577 North Woodward Avenue<br>Suite 300<br>Bloomfield Hills, MI  48304-2820<br>Tel:  248-203-0700<br>Fax:  248-203-0763<br>*Attorneys for Hoechst Aktiengesellschaft;*<br>*Aventis Pharmaceuticals Inc.* |
| Louis M. Solomon, Esq.<br>Hal Shaftel, Esq.<br>Colin A. Underwood, Esq.<br>Michael S. Lazaroff, Esq.<br>**SOLOMON ZAUDERER ELLENHORN**<br>**FRISCHER & SHARP**<br>45 Rockefeller Plaza<br>New York, NY 10111<br>Tel: 212-956-3700<br>Fax: 212-956-4068<br>*Attorneys for Andrx Corporation; Andrx*<br>*Pharmaceuticals, Inc.* | Norman C. Ankers, Esq.<br>**HONIGMAN MILLER SCHWARTZ**<br>**& COHEN**<br>2290 First National Building<br>Detroit, MI  48226-3583<br>Tel:  313-465-7306<br>Fax:  313-465-7307<br>*Attorneys for Andrx Corporation; Andrx*<br>*Pharmaceuticals, Inc.* |

by placing same in a properly addressed envelopes and depositing same in the Airborne Express

depository located in the City of Birmingham, Michigan.

    I declare that the statements above are true to the best of my information, knowledge and belief.

HOLLY L. McINTYRE

H:\HOME\FILES\CARDIZEM\hlmmdlaffomail070601.wpd